Mercury Bay Boating Club Inc., Respondent, v San Diego Yacht Club, Appellant, and New York Yacht Club, Intervenor, et al., Defendant.

In the Matter of San Diego Yacht Club, Appellant. Attorney-General of the State of New York, Appellant.

First Department, September 19, 1989

## APPEARANCES OF COUNSEL

*George N. Tompkins, Jr.,* of counsel *(John M. Boyle, Thomas J. Whalen* and *Diane Westwood Wilson;* and *David A. R. Williams* and *Andrew A. Johns,* of the New Zealand Bar, with him on the brief; *Condon & Forsyth,* attorneys), for respondent.

*Harold R. Tyler, Jr.,* of counsel *(Mark W. Smith, James E. Brandt* and *Blair Axel* with him on the brief; *Latham & Watkins,* and *Patterson, Belknap, Webb & Tyler,* attorneys), for appellant.

*David G. Samuels* of counsel *(Lawrence S. Kahn* and

*Pamela A. Mann* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for Ultimate Charitable Beneficiaries.

*Michael D. Hess* of counsel *(Marjorie L. Cohen* with him on the brief; *White & Case,* attorneys), for defendant.

*James W. Rayhill* of counsel *(Richard M. Waldron* with him on the brief; *Carter, Ledyard & Milburn,* attorneys), for intervenor.

## OPINION OF THE COURT

SULLIVAN, J. P.

This appeal is from an order which, on the basis of a determination that the defense of the America's Cup in a catamaran violated the provisions of the deed of gift of the America's Cup, set aside the results of the 1988 America's Cup races between the yachts of the San Diego Yacht Club and Mercury Bay Boating Club, declared Mercury Bay's challenging yacht, *New Zealand,* to be the winner of those races, and ordered San Diego, as trustees of the America's Cup, to forfeit the Cup to Mercury Bay.

The America's Cup, first won by the Yacht *America* in a race around the Isle of Wight on August 22, 1851, is the corpus of a charitable trust created in the 19th century under the laws of New York. Originally donated on July 8, 1857 by America's six owners to the New York Yacht Club to be held in trust "as a perpetual challenge cup for friendly competition between foreign countries", the Cup was twice returned to George L. Schuyler, the sole surviving donor, after questions arose regarding the terms of the trust. The Cup was reconveyed to New York for the final time pursuant to a deed of gift executed on October 24, 1887 by Schuyler, as donor, and New York, as donee. Under the terms of the deed, which has been amended by orders of the Supreme Court in 1956 and 1985, the holder of the Cup acts as sole trustee of the charitable trust, and is succeeded by whoever successfully challenges the trustee in a race for the Cup. New York served as trustee until 1983, when its defender, *Liberty,* was defeated by *Australia II,* the entry of the Royal Perth Yacht Club. Royal Perth, as successor trustee, then lost the Cup in 1987 to San Diego's *Stars & Stripes '87.*

The deed of gift specifies the permissible length for the competing vessels and outlines the timing and supporting

documents necessary for a valid challenge. The only constraints on boat design are set forth in the deed, which states that a challenger is entitled to a match against any "yacht or vessel", "propelled by sails only", which, if single-masted, must measure between 44 and 90 feet on the load waterline. The challenger may determine the dimensions of its boat within this specified size range, as well as the time of the race, on condition that it provide at least 10 months' notice to the defender. Races must be conducted between May 1 and November 1 in the northern hemisphere, and between November 1 and May 1 in the southern hemisphere.

The deed of gift also provides that America's Cup races shall be sailed under the rules of the club holding the Cup. San Diego follows the rules of yacht racing promulgated by the International Yacht Racing Union (IYRU). Under the IYRU rules, an international jury, whose decisions are final, referees the match and decides all protests.

The deed of gift leaves all other details for resolution by the competitors: "The Club challenging for the Cup and the Club holding the same may, by mutual consent, make any arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all other conditions of the match, in which case also the ten months' notice provision may be waived." By this "mutual consent" provision, the deed envisions the competitors' agreement on the overwhelming number of issues not controlled by the literal terms of the trust instrument. Failing such agreement, however, the deed of gift provides explicitly that the defender shall set the venue and the courses for the race.

The deed of gift is silent as to the type of boat to be used by the defender, stating only that "[t]he challenged Club shall not be required to name its representative vessel until at a time agreed upon for the start, but the vessel when named must compete in all the races, and each of such races must be completed within seven hours." Although both monohulls and multihulls were in existence at the time of its final revision in 1887, the deed of gift does not explicitly bar the use of a multihulled vessel or require the trustee to defend in a vessel having the same number of hulls as the challenger. Nor is there any express mandate that the competing vessels be identical or even substantially similar.

Nevertheless, until 1988, monohulls have been utilized throughout the history of the America's Cup competition since

all the races were conducted under the "mutual consent" provision of the deed of gift. Between 1857 and 1937, New York successfully defended the America's Cup 16 times, twice against Canadian challengers in the 1870's, and on the other 14 occasions against challengers from British yacht clubs. In each instance, only a single challenger competed.

In the 20 years after the 1937 race there was little interest in the America's Cup, and challenges were not forthcoming. The large ocean-going yachts, known as "J-boats", which were used in the competition prior to World War II, had become too expensive to maintain, and were no longer being built. At that time, the deed of gift permitted only the use of boats measuring between 65 and 90 feet on the load waterline. In 1956, in an attempt to revive interest in the competition, New York successfully petitioned the court and obtained an amendment of the deed lowering the minimum waterline length from 65 to 44 feet, so that the competition could be conducted in yachts of the international 12-meter class, and deleting the requirement, which had put foreign challengers at a disadvantage, that the challenger sail to the site of the match "on its own bottom". In its 1956 petition, New York argued that the greatly increased cost of both building a large racing yacht and maintaining and racing it were circumstances not anticipated by the grantor of the trust.

The first postwar match was sailed in 1958. With the exception of the 1988 match, every match since World War II has been conducted in 12-meter yachts. As the event grew more successful and generated greater public awareness, an increasing number of challengers expressed interest in competing for the Cup.

The deed of gift provides that "when a challenge from a Club fulfilling all the conditions required by this instrument has been received, no other challenge can be considered until the pending event has been decided." Since this provision allows the first challenger to exclude all others, a mechanism which would accommodate multiple challengers was sought. On December 7, 1962, New York issued a memorandum stating that in the event it successfully defended the Cup in 1964, and, within 30 days, received more than one challenge for the next match, it would regard the challenges as "received simultaneously" and "after due consideration [would] determine which to accept"; that it expected to defend the Cup in 12-meter yachts (and would give two years' notice of a change in class); and that it believed that "it would be in the

best interest of the sport and of the competition for the America's Cup if such matches were not held more frequently than once every three years." New York issued a similar memorandum shortly before each subsequent defense.

Within 30 days of the conclusion of the 1967 match, New York received bids from challengers, all of whom agreed to an elimination series of races, with the winner earning the right to challenge New York for the Cup. Similar procedures were followed for each America's Cup match until 1988. Experience has shown that the elimination series enhances the quality of the competition and increases the likelihood that the best qualified challenger will win the right to sail a match for the Cup. Moreover, as the number of participants has increased with each match, it has attracted a greater level of interest around the world.

In the 1983 competition, seven foreign yacht clubs vied for the right to sail a match for the Cup and, for the first time in 132 years of competition, a challenger succeeded in wresting the Cup from New York. In late 1986, in Fremantle, Western Australia, 13 yacht clubs representing six Nations competed to determine which would challenge Royal Perth for the Cup. In the finals, *Stars & Stripes '87,* skippered by Dennis Conner and sailing under the burgee of San Diego, beat Royal Perth's defender *Kookaburra III* four races to none.

Even before the culmination of its 1987 America's Cup campaign, San Diego had intended, if successful, to conduct its first defense of the Cup in 1990 or 1991 in 12-meter yachts, and in the familiar and traditional multiple-challenger format. Yacht clubs all around the world began preparations to compete in that event. In the midst of these preparations, Mercury Bay, by letter dated July 15, 1987, issued a notice of challenge to San Diego demanding a match less than a year later, and disclosing the dimensions of a challenging yacht of a size, 90 feet on the load waterline, that had not been built in 50 years. As noted previously, this length was the largest permitted under the deed of gift. Most foreign yacht clubs would be unable to compete on the terms demanded by Mercury Bay inasmuch as they were already preparing for a match in 12-meter yachts. San Diego announced that the terms of challenge were unacceptable.

On September 2, 1987, Mercury Bay filed suit, seeking a declaration of the validity of its challenge, and for a preliminary injunction prohibiting San Diego from considering any

other challenges before its own. Several days later, San Diego, as trustee of the America's Cup, commenced a second action, seeking an interpretation or amendment of the deed of gift to authorize a continuation of the uniform practices of the only two prior trustees. Specifically, San Diego urged the court to permit an elimination series so as to further, to the greatest extent possible, the donor's stated purpose of fostering "friendly competition between foreign countries". It was alleged that Mercury Bay sought to exclude challengers from at least nine other countries, and "to return the competition to an age when it could only be enjoyed by that handful of individuals with sufficient means to journey to the site of the competition." In opposing San Diego's application, Mercury Bay insisted that the deed of gift was clear and unambiguous and should be enforced according to the plain meaning of its literal terms.

The Attorney-General of the State of New York participated in both proceedings pursuant to EPTL 8-1.1 (f), which provides that the Attorney-General shall represent the beneficiaries of charitable trusts.[1] He supports San Diego's position in both proceedings, which were heard together and decided without taking testimony. The court rejected San Diego's application to interpret or amend the deed of gift and granted the motion for a preliminary injunction, declaring that Mercury Bay's notice of challenge was valid, and holding that San Diego's options were to "accept the challenge, forfeit the cup, or negotiate agreeable terms with the challenger."

Both parties thereafter made various proposals under the mutual consent clause of the deed, but to no avail, and San Diego proceeded with its preparations for a defense of the Cup. Although not required to name its boat until the start of the first race, in late January 1988 San Diego announced its decision to race in a multihull yacht, the dimensions of which would fall within the parameters permitted by the deed of gift, although it would be smaller than Mercury Bay's crew-ballasted, fin-keel monohull.

Mercury Bay sought to hold San Diego in contempt, arguing that its announced intention to meet Mercury Bay's challenge in a catamaran would deny Mercury Bay the "match" to

---

1. The Attorney-General also claims standing as a necessary party, pursuant to EPTL 8-1.4 (e) (1), insofar as San Diego seeks instructions relating to the administration of the America's Cup and a construction of the deed of gift under which the Cup is held.

which it was entitled under the deed of gift and therefore violate the court's earlier order. Mercury Bay claimed that the deed's use of the word "match" required the defending vessel to be "like or similar" to the challenging vessel. San Diego responded that the court's prior decision had construed the deed literally, that nothing in the deed required similarity of vessels, and that the degree of similarity demanded by Mercury Bay was available only by consent.

By decision dated July 25, 1988, the court denied Mercury Bay's motion, holding that "[n]either this court's order, nor the terms of the deed of gift incorporated therein, so unequivocally state that multihulled boats are prohibited or that a defender must [meet] the challenger in a 'like or similar' yacht, so as to constitute contempt by San Diego if it chooses to defend in such a boat." While stating that "[n]othing in this decision should be interpreted as indicating that multihulled boats are either permitted or barred under the America's Cup deed of gift", the court concluded that the "time has come for the sailors to be permitted to participate in the America's Cup". It directed the parties "to proceed with the races and to reserve their protests, if any, until after completion of the America's Cup races." San Diego and Mercury Bay thereafter sailed a match for the America's Cup in early September 1988. San Diego's defending catamaran *Stars & Stripes* defeated Mercury Bay's monohull *New Zealand* two races to none.

■ Mercury Bay, arguing that San Diego's defense of the America's Cup in a multihull yacht violated the deed of gift and the court's prior order, moved to set aside the results of the races, and have Mercury Bay declared the winner, and for an order directing that the Cup be turned over to it. San Diego cross-moved for a declaration that its defense complied with the deed and the court's order. Both motions addressed whether, in the absence of mutual consent, the deed of gift requires the trustee to defend the America's Cup in a vessel "like or similar" to the challenging vessel. Finding that San Diego had attempted "to retain the Cup at all costs so that it could host a competition on its own terms", thereby violating "the spirit of the Deed", the court held that "San Diego's defense of the America's Cup in a catamaran against Mercury Bay's monohull challenge clearly deviated from the intent of the donor" that the competing vessels be "somewhat evenly matched". San Diego's yacht was disqualified, Mercury Bay's challenger declared to be the winner of the two races, and San

Diego directed to assign and transfer the America's Cup, and thus the trusteeship, to Mercury Bay. San Diego and the Attorney-General appeal. We reverse.

The deed of gift of the America's Cup established a charitable trust, the trustees of which, as with all trusts, must act in a manner consistent with the terms of the trust. *(See, e.g., St. Joseph's Hosp. v Bennett,* 281 NY 115, 123.) In interpreting a trust, courts must look to the intent of the settlor as expressed in the trust instrument. *(Matter of Jones,* 38 NY2d 189, 193.) A court cannot look beyond the trust instrument where the donor's intent is expressed in clear and unambiguous terms. *(Loch Sheldrake Assocs. v Evans,* 306 NY 297, 304.) Absent ambiguity, a court may not read new terms into a trust instrument. *(Gross v Cizauskas,* 53 AD2d 969, 970.)

In finding that the vessels must be "somewhat evenly matched", the court promulgated a rule that is neither expressed in, nor inferable from the language of the deed of gift, which expressly and specifically addresses both the type of vessel eligible to compete and the required degree of similarity between the competing vessels. It requires the challenger to give 10 months' notice to the defending club and provides that the notice of challenge must include the name, rig, owner, and four specified dimensions of the challenging vessel—load waterline, waterline beam, maximum beam, and draft. Nothing in the deed suggests that the defender's selection of its boat is limited in any way by these specifications. On the contrary, its terms emphasize the broad latitude granted the defender, which is permitted to field "any one yacht or vessel constructed in the country of the Club holding the Cup."

The only design constraints imposed by the deed are the following:

"The competing yachts or vessels, if of one mast, shall be not less than forty-four feet nor more than ninety feet on the load water-line; if of more than one mast they shall be not less than eighty feet nor more than one hundred and fifteen feet on the load waterline. * * *

"Centre-board or sliding keel vessels shall always be allowed to compete in any race for this Cup, and no restriction nor limitation whatever shall be placed upon the use of such centre-board or sliding keel, nor shall the centre-board or sliding keel be considered a part of the vessel for any purposes of measurement."

By these terms, the deed of gift thus also defines the required

degree of similarity between the competing vessels. Both must be "yachts or vessels", "propelled by sails only"; if single-masted, they must measure between 44 and 90 feet on the load waterline.

After analyzing these provisions in an opinion rendered before the match, the court stated: "Other than the size range for competing boats, the deed makes no design constraints other than that centerboards and sliding keels shall always be permitted and are not considered part of the boat for measurement purposes." Yet, in its postrace decision, the court, citing two of its provisions, held that the deed requires the defender and challenger to be "somewhat evenly matched". The court relied upon the clause, described by it as "the most significant sentence of the Deed", which sets forth the condition of the gift, namely, that the America's Cup was established to foster "friendly competition between foreign countries". This language is precatory only and imposes no affirmative obligation on the trustee to use any particular type of vessel in its defense of the Cup. (See, Matter of Sparacio, 61 AD2d 486, 488, affd 47 NY2d 771.)

As a second ground, the court found that because the challenger must notify the defender of four specified dimensions of the challenging vessel, the defender is required to conform its boat to the challenger's. We cannot find such an intent, especially since the author of the deed could have stated the rule in a few words, had he so desired. For example, in providing that the defender shall race in "any one yacht or vessel", he could have added the phrase "of the same dimensions" or "somewhat evenly matched to that of the challenger". But no such phrase appears.

As we read the deed of gift, the notice provision was designed to afford the trustee sufficient time to build an adequate vessel to defend the Cup, not to require that vessel to meet the challenger's specifications. If any inference is to be drawn, it would be that the donor intended, as in many sports, to afford the defender a limited initial advantage. In any event, where the donor could have spelled out a similarity rule, but did not, it was error for the court to supply one, absent a clearly expressed intention to impose such a requirement. (See, Uihlein v Matthews, 172 NY 154, 159; Trowbridge v Trowbridge, 182 Misc 191, 194, affd 269 App Div 826.)

Indeed, in denying the motion to hold San Diego in contempt for planning to race in a boat not similar to the

challenger's, the court stated, "Conclusive effect and a result-ing contempt finding cannot be based upon the language of the deed requiring the challenger to state the dimensions of its boat in the Notice of Challenge." The court specifically noted that the terms of the deed do not mandate similarity, and concluded that because the language is "not so clear", a finding of contempt was "utterly unwarranted".

■ Eight months later, however, the court found that the import of the very same terms of the deed had become "clear" and "obvious". San Diego's defense in a catamaran, the court held, "clearly deviated from the intent of the donor". A rule so difficult to discern as "utterly" to preclude a finding of contempt cannot be, with respect to the same instrument, so readily inferable as to support the drastic remedy of forfei-ture. We have difficulty in accepting the court's postmatch holding as to the clarity of a rule which, before the match was less than clear.

As already noted, other than a waterline length limitation, the deed does not contain any design restraints. It states that the defender may race "any one yacht or vessel constructed in the country of the Club holding the Cup." And, while "any yacht" might seem sufficient to assure the broadest range of eligibility, the deed language goes even further in extending eligibility to "any vessel", perhaps the most expansive term conceivable for any water-borne vehicle. In the face of lan-guage of such breadth—"any one yacht or vessel"—the burden was on Mercury Bay to point to some term of the deed excluding multihulls, or to an intent, clearly expressed therein, to accomplish such a result. It failed to make such a showing.

Moreover, the court's views as to the "inherent" inequality of monohulls and multihulls reflect a marked departure from its own findings on the same issue in its prematch decision disposing of the contempt motion. In rejecting Mercury Bay's argument that there was no need for the donor specifically to exclude multihulls because mixed races would never have been contemplated in the nineteenth century, the court noted that in a number of instances from Schuyler's time to the present, monohulls and multihulls had raced together on the same course without necessarily being handicapped or divided into separate classes. As the court pointed out: "In at least some instances, the only design limitation appears to be length."

Even though the court did not find ambiguity and acknowledged that, in such circumstances, the intent of the donor is to be gleaned from the language of the deed, it nevertheless sought to buttress its determination by reference to extrinsic evidence. It seized on the deed's use of the word "match" to declare that the donor "intended" that the competing yachts or vessels should be "evenly matched". The court quoted a general definition of "match" in an April 15, 1871 letter written by Schuyler to show that he intended competition on "equal terms", but ignored the limiting language appearing just before the definition it quoted. Schuyler's actual words, in context, were: "A match between two cricket or base-ball clubs means one side against the other side; but the cardinal principle is that in the absence of all qualifying expressions, a 'match' means one party contending with another party upon equal terms as regards the task or feat to be accomplished."

Schuyler's specific explanation in the same letter of how and why the term "match" was used by him and the other signers of the original deed, completely ignored by the court, dispels the notion that the term carries with it a "somewhat evenly matched" rule: "I can state with certainty that all the signers of the letter to the New York Yacht Club presenting the Cup won by the *America* in 1851 considered the word 'match' in connection with the conditions proposed by them, as meaning that but one vessel could start against a party challenging for the possession of it." Schuyler's sole purpose in writing the 1871 letter was to respond to New York's initial position that the defender was free to send an entire fleet against a lone challenger. Thus, he defined "match" only in the sense of a competition between two contestants; there is no hint of any intention on his part to require likeness or similarity between the competing vessels. Indeed, many passages in that same letter demonstrate the donor's view that a match need not be a race between similar or "somewhat evenly matched" vessels, e.g., "[A] challenge to sail the *America* in a match against any British vessel whatever for any sum for one to ten thousand guineas, merely stipulating that there should be not less than a six-not *[sic]* breeze." Schuyler's discussion of the deed is replete with instances of his own application of the term "match" to contests where the boats

were highly dissimilar.[2] All that was required for a "match" was for someone to propose a one-on-one race, according to the terms stated in the deed of gift.

In any event, of greater importance is Schuyler's specific explanation of the dimensions clause, which was wholly ignored by the court. When the present deed was written in 1887, Schuyler responded to charges of unfairness leveled against, *inter alia,* the provision requiring the challenger to give 10 months' notice of four principal dimensions of its boat, while permitting the defender to nominate its boat as late as the start of the first race. Schuyler addressed that clause quite directly: "The main reason we ask for the [dimensions] is to know what kind of a vessel we have to meet. I believe the challenged party has a right to know what the challenging yacht is like, so that it can meet her with a yacht of her own type if it is to be desired." If extrinsic evidence is to be considered, there can be no clearer expression of the intention of the donor that the defender was not required to meet the challenger with a similar vessel. Schuyler emphatically denied both that the defender was entitled to know in advance "the lines" of the challenging vessel, and that the four required dimensions gave away those lines: "The Volunteer and Mayflower is a case in point. The dimensions of these two yachts are almost identical, and still their lines are very different". Thus, even if there were a general requirement of similarity fairly inferable from the deed, the statements of the donor himself negate any notion that the giving of the four dimensions would enable, much less require, the defender to produce a "somewhat evenly matched" boat.

The court correctly noted that if consideration of extrinsic evidence is appropriate, the trustee's administration and interpretation of the trust would be persuasive in construing it. The only evidence referred to by the court, however, was the fact that, when the competitors agreed to sail similar boats, or agreed to a rating rule that gave them an incentive to sail similar boats, they in fact did so. What it wholly ignored was the trustee's decisions on the very question involved here.

In 1907, Sir Thomas Lipton, on behalf of the Royal Irish

---

2. For example, he states that the *America* syndicate would have "matched" the *America* against "any schooner"; "matched" her against "either schooner or cutter"; they would have "matched" her against "any British vessel whatever"; "matched" her against the fleet of the Royal Yacht Squadron; they "matched" their 170-ton schooner against a 100-ton schooner and took her owner's money.

Yacht Club, delivered a notice of challenge to New York which specified that the challenger would measure to a rating of 68 feet under Class J of the New York Yacht Club Rules, and further stipulated that the defender would similarly measure. Concluding that the trustee could not accept any challenge which purported to add any design limitations beyond those expressly stated in the deed, the New York membership unanimously adopted the following resolution, which, in part, read:

"That no agreement should be made with any challenger which imposes any other limitation or restriction upon the designer than such as is necessarily implied in the limits of water-line length expressed in the deed. * * *

"While the defending Club cannot require that the challenging vessel be of any given size, so long as she is within the limits permitted by the Deed of Gift, it should not consent to any limitations upon the power or size of the defending vessel, other than such as is imposed by the deed."

The same issue was raised several years later in 1913, when Lipton renewed his challenge and again asked for a commitment by New York that it would defend in a similar vessel. Lipton made the same arguments as made by Mercury Bay, i.e., that a "fair" match requires similarity between the boats, and that the deed should be interpreted to require the defender to "match" the size and type of the challenger. The New York membership again rejected the challenge in a resolution, noting that it would deprive "the defending Club of its right under the deed of gift to determine for itself the size and power of the yacht which it may select to defend the Cup".

New York's letter conveying its resolution to Lipton made it clear that, under either the "mutual agreement" or "challenge" provision of the deed, the challenger has absolutely no right to impose additional design restrictions on the defender: "This Club has been called upon repeatedly to explain to [Lipton] that the deed gives no such right; and has already twice by deliberate and formal action, and by unanimous vote, determined that it will not accept any challenge involving the assertion of such a right."

Quite apart from the question of whether ambiguity is present, the difficulty with reading into the deed of gift a "somewhat evenly matched" requirement is that it establishes a completely unworkable standard. In any yachting competi-

tion, whether match (one-on-one) or fleet racing (many competitors over the same course), the degree of similarity of the yachts eligible to compete in the event is dictated by objective, measurable standards expressly set forth in the rules governing the event.

Two types of rules govern the degree of similarity of eligible yachts. The first, a rating rule, where yachts of varying types, design, and size are physically measured and assigned a rating according to the applicable rule, such as the International Offshore Rule, produces a handicap (usually expressed in seconds); the handicaps are then subtracted from the actual elapsed times so as to determine the order of finish. The other, generally referred to as a class rule, does not involve handicaps; rather, a yacht, after being certified as complying with the applicable rule, races boat-for-boat with the other contestants, with the first to finish claiming the prize.

Class rules can be more or less restrictive. An unrestrictive class rule has few design constraints, such as a length of waterline only rule, which allows almost total freedom of design and often leads to competition between vastly dissimilar yachts. A more restrictive class rule, such as the International 12-meter class rule, uses specified formulae and weights and measures to produce similar but not identical yachts, leaving some flexibility for the designers. The most restrictive class rule is a "one-design" rule, such as the International Laser Class Rule, where the yachts are produced from the same mold. Class rules in the latter two categories are quite detailed.

Obviously, different types of class rules test different skills. In one-design events, design, construction, and technology are largely irrelevant, as everyone competes in identical yachts, and the winner is determined by sailing skill only. At the other extreme, under an unrestrictive class rule, success requires across-the-board excellence—in design, construction, management, and sailing. Competitors and designers are challenged to produce the fastest possible yacht allowed by the rule. The donors of the America's Cup obviously intended the relatively unrestricted type of competition for their matches. Indeed, in 1907, New York, trustee for 126 years under the deed of gift, passed a unanimous resolution that "[t]he 'America's' Cup, held by the Club as the Trustee under the Deed of Gift, is a trophy which stands preeminently for speed, and for the utmost skill in designing, constructing, managing, and handling the competing vessels, and should therefore be sailed

for by the fastest and most powerful vessels that can be produced."

In contrast to the vague standard adopted by the court here, the standards for both rating and class rules are set forth in specific, objective terms, and compliance can be determined by physical measurement of the competing yachts. As Kenneth Weller, director of the Offshore Office of the United States Yacht Racing Union and a leading authority on such matters, noted: "From the point of view of the rules of yacht racing two yachts are sufficiently 'like' or 'similar' to race against each other if each complies with the specific, printed rules that apply to the particular event. Vague and imprecise expressions such as 'like' and 'similar,' which have a broad range of subjective interpretations, cannot be administered in the rules of yacht racing without accompanying and detailed definition. Further, the International Yacht Racing Rules of [IYRU] make it clear that if these words (or any others) do not appear in the printed rules which apply to the event then they have absolutely no status in regard to [the] event."

Thus, given its obvious deficiency as a measurable standard, a "somewhat evenly matched" requirement has the potential, in the absence of mutual consent, to foster judicial involvement in the question of boat eligibility, a matter which, in our view, is best left to those charged with the responsibility for judging the match. It should be noted that under the IYRU rules, compliance by a yacht with the applicable class or rating rule is determined by a measurement committee which physically measures the yacht and its sails, and certifies that the yacht complies with the rule, or refuses so to certify. Any competitor dissatisfied with the conclusion of the measurement committee may protest its decision to the international jury, which has the authority to hear and determine a charge that a yacht has violated a rule, including those governing eligibility to compete in the event.[3]

Finally, we believe that, even if the deed of gift were to be

---

3. The measurement committee impaneled for the September 1988 America's Cup match, composed of one representative appointed by the challenger and one appointed by the defender, and a chairman appointed by IYRU, certified that the catamaran *Stars & Stripes* and the monohull *New Zealand* complied fully with the written rules applicable to the event. Mercury Bay did not protest that determination to the international jury, which, in this case, was composed of five members, all IYRU-certified yacht racing judges of vast experience and international repute, "fully acceptable" to San Diego, and from countries other than the United States and New Zealand.

construed so as to bar the use of a catamaran in defense of the Cup against a monohull, the drastic remedy of forfeiture was unwarranted. Forfeiture, an extreme remedy abhorred by equity *(Fifty States Mgt. Corp. v Pioneer Auto Parks,* 46 NY2d 573, 577), should be applied only where absolutely necessary to preserve the object or purpose of a trust. Since it should be sparingly applied, forfeiture is appropriate only when the parties' conduct merits the ultimate penalty. *(See, Elia Bldg. Co. v New York State Urban Dev. Corp.,* 54 AD2d 337, 344; *see also, Babylon Assocs. v County of Suffolk,* 101 AD2d 207, 216.) The facts here, even as interpreted by the hearing court, do not justify forfeiture of the Cup.

In deciding what kind of yacht or vessel to build to defend against Mercury Bay's challenge, San Diego had to rely on the written terms of the deed of gift, which, in the absence of mutual consent, provides a minimally restrictive class rule. In fact, Mercury Bay stated that it desired to compete in a larger yacht "utilizing modern technology outside class or rating rules".

Thus, Mercury Bay itself demanded an unrestricted design rule, without any agreement on a class or rating rule, or any system for handicapping or equalizing the competitors beyond the waterline length limitations expressly set forth in the deed of gift. In its first decision, on November 25, 1987, the court agreed that the deed contained no other limitations. "Other than the size range for competing boats", it noted, "the deed of gift makes no design constraints other than that centerboards and sliding keels shall always be permitted". In its July 25, 1988 decision rejecting Mercury Bay's contempt motion, the court gave an additional indication of its view that there was no "somewhat evenly matched" rule either stated in the deed or readily apparent from its terms. The court further stated that Mercury Bay's argument that a race between a monohull and a multihull is inherently unfair was "fundamentally shaken" by the evidence of a history of mixed racing.

Furthermore, in rejecting Mercury Bay's contempt motion, based upon what appeared to be a continuing reluctance to stray far from the terms of the deed itself, the court gave no hint of its views on the use of a catamaran, although it did warn San Diego that in competing in such a boat it proceeded *at its* peril. At the very least, it had stated a second time that the waterline length limitations were the only design restrictions clearly set forth in the deed. Moreover, the court had

refused Mercury Bay's request to infer from the deed a rule requiring some similarity between competing vessels.

Under these circumstances, it was inappropriate for the court, after the race, to engraft onto the deed a rule so elusive as to preclude a finding of contempt eight months earlier. In any event, having refused to hold San Diego in contempt, the court should not have ordered a forfeiture on the basis of the very inference the court itself had earlier refused to draw. Moreover, it should be noted that at each stage San Diego sought the Attorney-General's approval and took every possible precaution to assure that its actions were consistent with the deed of gift and its fiduciary responsibilities. It sailed its catamaran in defense of the Cup with the explicit approval of the Attorney-General. In such circumstances, the penalty of forfeiture was unjust and unwarranted. At the very least, San Diego should have been permitted to rerun the race with a monohull.

By exercising its rights under the deed of gift in accordance with the letter of that instrument, Mercury Bay was able to force San Diego into a match barely a year after it had won the Cup, despite the fact that America's Cup matches have traditionally been held 3 or 4 years apart. Mercury Bay was able to force San Diego to design and build, from scratch, a yacht that was more complex, more expensive, and riskier than those that had previously been used, when San Diego wanted to compete in yachts of the international 12-meter class. Finally, Mercury Bay was able to force San Diego into a one-on-one match, when San Diego wanted to continue the tradition of a multinational challenger competition.

While a challenger, absent mutual consent, can accomplish all of this, under the deed of gift the defender has two important rights, viz., to decide on the type and size of boat in which it will defend—which need not be announced until the start of the match—and to name the site of the races. The argument that the deed of gift requires the defender, or any competitor, to attempt to compete in a boat of "inherently the same speed capability" as the challenging vessel, or "as alike as reasonably possible" to its rival, betrays a fundamental misunderstanding of the history and function of the America's Cup competition. For 140 years, challengers and defenders alike have spent fortunes and expended immeasureable effort to gain any speed advantage, however slight, to enhance their chances for victory. That is the very essence of America's Cup competition. Moreover, to compel the trustee to accept con-

straints upon the competition that are not specified in the trust agreement, without the mutual consent of both challenger and defender, would itself contravene the competitive scheme contemplated by the deed of gift.

Since the court improperly relied on extrinsic evidence to construe an unambiguous instrument, thereby creating a totally new and unworkable eligibility rule, which it belatedly used to reverse the result of a match and to justify the extreme penalty of forfeiture, its order cannot stand.

Accordingly, the order of the Supreme Court, New York County (Carmen Beauchamp Ciparick, J.), entered April 7, 1989, should be reversed, on the law, without costs or disbursements, and a declaration made that San Diego's catamaran was an eligible yacht, that it was the winner of the two races held on September 7 and 9, 1988 for the America's Cup and that San Diego, as the winner of the two races, is entitled to the America's Cup in accordance with the terms and conditions of the deed of gift of October 24, 1887.

RUBIN, J. (concurring). Upon this appeal, the court is presented with the question of whether, under the deed of trust from George L. Schuyler, dated October 24, 1887, conveying the America's Cup to the New York Yacht Club, it was permissible for the defender San Diego Yacht Club to race the catamaran *Stars and Stripes* against Mercury Bay Boating Club's monohull *New Zealand* in the 1988 competition. This statement of the issue, however, does not convey the essence of the controversy between the contenders, which extends beyond considerations of law into an area where our courts have long ago declined to venture.

Precedent may be found in the venerable case of *Pierson v Post* (3 Caines 175 [1805]) which involved a remarkable dispute over title to a fox pelt. The case was brought by Lodowick Post, an aggrieved sportsman. While out with his hounds on public land hunting a fox, Mr. Pierson, with full knowledge of Post's pursuit, killed the fox and made off with the carcass. The issue, as stated on the appeal, was "whether Lodowick Post, by the pursuit with his hounds in the manner alleged in his declaration, acquired such a right to, or property in, the fox as will sustain an action against Pierson for killing and taking him away?" *(Pierson v Post, 3 Caines 175, 177, supra).* The court held that it did not and reversed the judgment entered by the lower court.

*Pierson v Post (supra)* is one of the first cases encountered

by the neophyte law student and stands for a basic proposition of property law that no right to a wild animal is created until it is reduced to possession by so circumscribing its movement that escape is impossible. The contention between the parties, however, was not whether title to the fox had been acquired, but rather whether it was sporting for Pierson to have killed the fox when Post, in the language of the reporter, "was on the point of seizing it" *(Pierson v Post, supra,* at 175, head-note). The majority, confining their consideration to questions of law, stated, "However uncourteous or unkind the conduct of Pierson towards Post, in this instance, may have been, yet his act was productive of no injury or damage for which a legal remedy can be applied" *(supra,* at 179-180). It is clear that the court declined to entertain any consideration of whether Pierson's action in killing the fox was an affront to hunting etiquette or a breach of sportsmanship. Even the dissenting Justice (Livingston, J.) conceded, "This is a knotty point, and should have been submitted to the arbitration of sportsmen" *(supra,* at 180).

There is often a marked divergence in what may be deemed sporting and what a court will uphold as legal. For instance, if a court is requested to determine whether it is permissible for a hockey player to strike an opponent with his stick, causing injury, its consideration will be confined to legal matters. Hockey is a sport known for a tendency toward violence. The court will examine such questions as whether the hockey stick constitutes a weapon and whether it was wielded with the requisite intent to constitute an assault. Against these considerations, the court will assess the extent to which the injured player may be deemed to have consented to the use of such tactics by his participation in the game or whether the assault was otherwise justifiable *(see, e.g., People v Freer,* 86 Misc 2d 280, and cases cited therein). However, whether such aggressive use of a hockey stick may be accepted as sporting by hockey fans, the players, the leagues or their officials and whether the general level of violence is desirable for the sport are questions simply not material to the court's deliberation.

In the matter under review, a distinction must be drawn between the parties' desire for a ruling as to (1) whether the entry of a catamaran in the America's Cup race is consistent with the terms of the deed of trust and (2) whether it constitutes good sportsmanship under the particular ethos of the yachting community to pit a catamaran against a monohull. The failure to observe such a distinction leads to confusion

between what is actually stated in the deed of trust and the meaning sought to be attributed to it by reference to practices which are presently the custom in yacht racing. The practices of the sport in general and of the America's Cup competition in particular have undergone considerable change in the past and will no doubt continue to evolve in the future. The deed of trust, with some judicially sanctioned modifications, has governed the competition from 1857 to the present, from races between schooners on the New York Yacht Club's infamous "inside course" through the Narrows to contests between 12-meter yachts on an olympic course in open water. The deed must continue to govern the contest when the 12-meter yacht has passed into history along with the J-boat.

In its more recent form, the America's Cup race, like yacht racing in general, has been a competition between vessels of a specified class. Although this innovation was originally resisted in the early decades of this century by the New York Yacht Club, as trustees under the deed of trust, in 1929 the Club agreed to accept the Universal Rule's J Class to govern the dimensions of America's Cup contenders. After World War II, the 12-meter class of the International Rule was adopted and, in 1956, the deed of trust was modified to reduce the minimum load waterline dimension from 65 feet to 44 feet to accommodate the smaller vessels. (This modification also eliminated the requirement that the challenger sail to the race on its own bottom.) While the race has been conducted between 12-meter yachts from that time until the race at issue, the deed itself, besides specifying maximum and minimum length at the load waterline, does not require the boats to be of any particular design.

The practice of racing boats of a specific class (J or 12-meter) in the America's Cup competition arose by agreement between defender and challenger under the "mutual consent" clause of the deed of trust. As originally set forth in the 1857 deed, this clause provided, "The parties desiring to sail for the cup may make any match with the yacht club in possession of the same that may be determined upon by mutual consent; but in case of disagreement as to terms, the match shall be sailed over the usual course for the annual regatta of the yacht club in possession of the cup, and subject to its rules and sailing regulations". From the context, the original provision contemplated an agreement concerning only the course to be sailed and the rules to be observed during the race. In the 1887 deed, the clause was modified to provide that the compe-

titors "may, by mutual consent, make any arrangement satis-factory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all other conditions of the match, in which case also the ten months' notice provision may be waived." The question of whether the design of the competing yachts comes within the contemplation of the phrase "any and all other conditions of the match" presents, at best, an ambiguity, again considering both the context in which it appears and the fact that the specifications regarding eligibility are stated elsewhere in the deed. But, in practice, the provision seems to have been broadly construed to mean that the terms of the deed of trust may be modified by the contestants by mutual consent. Therefore, if the challenger and defender agreed to race in 12-meter yachts (as they had since 1958), the broad provisions of the deed of trust governing boat design would be replaced by the far more restrictive rules governing the 12-meter class.

Viewed against the backdrop of recent history, the 1988 contest between a monohull measuring 90 feet at the load waterline (twice the dimension for a 12-meter yacht) and a multihulled vessel appears to be an aberration. The monohull entered by Mercury Bay Boating Club is of a size which has not been built for America's Cup competition in the last 50 years, and San Diego Yacht Club's catamaran is of a type which has never been entered in the race. Nevertheless, San Diego may not be disqualified based upon the failure of their catamaran to conform to the requirement of any particular design class. In fact, neither yacht qualifies for inclusion in any specified level class since both are of "unrestricted" or "unlimited" design.

Moreover, under the time-honored distinction of *Pierson v Post (supra)*, the agreement to race boats of the 12-meter class, which has prevailed for only about 30 years, represents merely the current assessment of the contestants as to what constitutes a sporting challenge and not what is legally per-missible under the deed of trust. It constitutes a compromise between a contest which exclusively tests sailing skill (as between boats of a fixed design) and one which almost exclu-sively reflects sophistication of design (such as here, where the boats are built upon radically different design theories). The design class approach affords the builder some flexibility by permitting certain features to be varied in the attempt to improve the boat's speed while restricting the competitive advantage which may thereby be gained by requiring the

elements of the boat's design to comply with a prescribed formula (which, when applied, yields a result of 12 meters, from which the class derives its designation). The primary advantage of this approach, aside from yielding boats of somewhat comparable capabilities, is that it ensures that designs will be reasonably seaworthy. Its primary disadvantage is that it prohibits sweeping innovation.

The only concern for seaworthiness ever reflected in the deed of trust was a provision that the challenger (but not the defender) sail to the race "on its own bottom". This provision was eliminated, however, in the modification signed by the trustees (the New York Yacht Club, holder of the Cup until 1983) on December 17, 1956, thus eliminating both an obvious advantage to the defender and any allusion to the seaworthiness of either yacht. The over-all thrust of the deed, therefore, is not that the contestants race in truly ocean-going vessels but rather that they compete with the fastest boats on the water. Indeed, the modern racing yacht is almost totally devoid of amenities and exists only for the purpose of racing. There is nothing in the deed of trust which suggests that this design philosophy is contrary to its intent.

Mercury Bay nevertheless seizes upon the use of the word "match" in the deed, arguing that it reflects a requirement that the competing boats be reasonably matched in their capabilities. However, the use of the word is clearly designed to indicate that the America's Cup is a match race, viz., a race between one defender and one challenger, as opposed to a regatta, in which any number of boats compete in the same race. The word must be interpreted according to its obvious meaning which is clear and unambiguous.

The significance ascribed by the Supreme Court to the 1871 letter to the New York Yacht Club by George Schuyler, then the sole surviving member of the original trustees, is disproportionate. The context of his remarks is crucial to their interpretation. At issue was the question of whether the race was to be held between two yachts only or whether the challenger might be forced to compete against numerous defending boats, with the attendant risk that they would act in concert to his great disadvantage. In response to an inquiry from the New York Yacht Club (NYYC), Schuyler offered the following opinion: "I think that any candid person will admit that when the owners of the *America* * * * sat down to write their letter of gift to the NYYC, they could hardly be expected to dwell upon an elaborate definition of their interpretation of

the word 'match,' as distinguished from a 'sweepstakes' or regatta; nor would he think it very likely that any contestant for the cup, under conditions named by them, should be subjected to a trial, such as they themselves had considered unfair and unsportsmanlike." Schuyler went on to conclude, "It seems to me that the present ruling of the club [that one challenger sail against a fleet of defenders] renders the America's trophy useless as a 'a Challenge Cup,' and that for all sporting purposes it might as well be laid aside as family plate."

The lower court's interpretation of Schuyler's remark that "a match means one party contending with another party upon equal terms as regards the task or feat to be accomplished" is simply too broad. The reference to "equal terms" clearly contemplates a match race between the challenger and a *single* defender, "one party contending with another party", as Schuyler put it. At no point in this episode was the design of the competing boats or a requirement for their similarity ever in issue. Nor does it appear that the mutual consent clause contained in the original (1857) deed is sufficiently broad to permit the competitors to designate, by agreement, the specifications of the vessels.

It is true that, in the recent history of the America's Cup competition, the tacit adoption of the 12-meter class and, prior to that, the J class, has had the effect of introducing a certain comparability in the competing boats. However, this is merely incidental to the class design formula and not a reflection of any intent contained within the deed of trust. It should be noted that, when the deed was modified to allow 12-meter yachts to compete, this purpose was achieved by merely reducing the minimum length to 44 feet and not by specifying that the contestants race in any *particular* class of yacht or that they both race in the *same* class of yacht. The adoption of a class standard for the race was entirely by agreement between the contenders for the Cup, according to the broad interpretation accorded to the mutual consent clause. Accepting, arguendo, such a liberal interpretation, it should nevertheless be apparent that, when no agreement can be reached between the competitors, the language of the deed of trust governs the specifications of the boats.

The deed gives the contestants the widest latitude in the design of the yachts in which they choose to compete. The reference to a "yacht *or vessel* propelled by sails only" (emphasis added) constitutes the broadest possible language. Inclusion

of the term "vessel" demonstrates that no limitation on design was intended, excluding even the inference that a competitor is restricted to the use of a boat customarily regarded as a "yacht". It is an inescapable conclusion that, had it been the intent of the deed of trust to exclude any type of sailboat from the competition, such expansive language would not have been employed. Moreover, it is not disputed that catamarans were known when the deed was drafted, and it would have been a simple matter for the settlor to bar them from competition by restricting eligibility to a *monohull* "yacht or vessel."

Were this court to make an assessment of whether San Diego's entry of a catamaran in the race was sporting, the result would be no different. It is apparent from the history of the race over the preceding 30 years that a 12-meter yacht was universally regarded as the appropriate boat to race. Both Mercury Bay and San Diego departed from accepted practice by entering boats of unlimited design. Upon equitable principles, the court would therefore be constrained to consider the competitors in pari delicto and decline to assist either of them. This analysis, however, merely illustrates the shortcoming of such an approach, for it was not the rules of the sport which the competing clubs intended to circumvent but the laws of physics.

The speed of a single-hulled, keeled sailboat (a "displacement hull") with a fixed ballast, such as a 12-meter yacht, is limited by a phenomenon known as wave drag. The maximum velocity (in knots) which a boat can achieve is numerically equivalent to a constant (between 1.6 and 2.0) times the square root of the length of the hull (in feet) at the waterline, which yields a result known as the "hull speed" of the vessel. Mercury Bay's approach to increasing speed was to construct a monohull incorporating design elements which overcome some of the inherent limitations of typical displacement-hull yachts. One stratagem employed is maximization of the waterline length within the limits imposed by the deed of trust, thereby maximizing hull speed under the formula. Other devices include the use of lightweight construction, relying on the weight of the crew to give the craft stability (so-called "crew-ballasted" or "crew-stabilized" design) and a wide beam to maximize the effect of crew ballast. The *New Zealand* also employs a semiplaning hull, which causes the boat to ride higher in the water as its speed increases, thereby reducing drag.

San Diego simply took the process to its logical extreme.

While *New Zealand* employs lightweight construction, at 75,000 pounds she is far heavier than *Stars and Stripes* at a mere 6,000 pounds, giving the catamaran a far superior power-to-weight ratio. The long narrow hulls of the catamaran are true planing hulls, having low wetted area and, hence, little hydrodynamic drag, which may be further reduced by the tactic of "flying a hull" (sailing with only one hull in the water). The use of sliding centerboards instead of a fixed keel permits drag to be further reduced: as speed increases, the same stability can be achieved with a shallower keel, which permits the centerboards to be raised thereby reducing wetted area. Finally, the catamaran's configuration of widely spaced, dual hulls has much the same effect as the wide beam employed in Mercury Bay's displacement hull design, maximizing the effect of "moveable ballast" (the crew) while, in addition, increasing lateral stability.

In conclusion, while the number of hulls differed, both clubs were attempting to overcome the same limitations inherent in conventional yacht design. As Bernard Smith presciently observed in 1963 in his enlightening book, The 40-Knot Sailboat, "As far as speed is concerned, the America's Cup racer merely represents the attainment of another kind of limit, for certain sailboats, beyond which it is impossible to make substantial progress" *(id.,* at 41).

None of this is to suggest, however, that the race between *Stars and Stripes* and *New Zealand* was anything but a foregone conclusion. The record contains computer projections for the performance of the two boats which indicate a decided advantage for the catamaran under virtually all conditions. Computer projections obtained by the magazine "Sail" (Aug. 1988, at 51 *et seq.)* also predict superior performance for the catamaran in all areas. To this extent, I must agree with the dissent that *Stars and Stripes'* victory was virtually ensured. I cannot agree, however, with the proposition that the America's Cup competition is now, if it ever was, a paradigm of good sportsmanship. At least one chronicler of the event has examined its history and found the level of sportsmanship and fair play exhibited by the competitors to be generally disappointing (Riggs, Keelhauled: The History of Unsportsmanlike Conduct and the America's Cup).

Viewed from either the historical or legal perspective, Mercury Bay's contention that a catamaran does not conform to the design elements required to be disclosed by the challenger to the defender cannot be accorded any significance. In the

first place, the original deed (1857) contained no disclosure requirement. When it was amended in 1887, *inter alia,* to require the challenger to sail to the defender's course and submit the name, rig, load waterline length, beam at load waterline, extreme beam and draught 10 months in advance, the American journal "Forest and Stream" branded it "An Act to Prevent Yacht Racing". The effect of the disclosure requirement was regarded by potential challengers as giving the defender a significant advantage in that, knowing the nature of the challenger's boat, the defender would then have 10 months to design and build a superior craft. The outcome of the furor which surrounded the amendment was that the 10-month notice requirement was almost routinely waived by the New York Yacht Club, and the only dimension it insisted upon was the length at the load waterline (Riggs, Keelhauled: The History of Unsportsmanlike Conduct and the America's Cup, at 35-39).

Viewed from a legal perspective, whether or not the dimensions required to be disclosed by the challenger may be deemed to contemplate a multihull design, it is clear that they do not abrogate the provision of the deed of trust which states that the race is open to "a yacht or vessel propelled by sails only" conforming to the load waterline length requirements. It is this provision which specifies the eligibility requirements for a challenging vessel, and it would be an error of construction to give precedence to a mere disclosure amendment which was not necessarily drafted with any great precision. Indeed, at the turn of the century, the amended deed was described by one critic, William P. Stephens, as "a mixture of bad sportsmanship, bad law and bad English, made in a hurry by a little clique" (Riggs, Keelhauled: The History of Unsportsmanlike Conduct and the America's Cup, at 63).

Undoubtedly, the attempt to bar a catamaran from America's Cup competition reflects a bias on the part of some in the yachting community against multihulled vessels. For example, in his 1986 book, Bob Bavier, who skippered *Constellation* to victory in the 1964 race, stated his view that the 12-meter yacht is "the ideal choice" for America's Cup racing and added, "Sure, a catamaran is much faster, faster even than a J-boat, but it is entirely different, a toy, albeit an impressive one, as compared to a majestic powerful machine" (Bavier, The America's Cup: An Insider's View, at 94). However, as "Sail" reported in August 1988 (at 152), one of those toys, the 75-foot *Jet Services V,* set the sailing speed record for a west-

east transatlantic run on May 31, 1988, sailing from Ambrose Light, New Jersey, to Lizard, England, in 7 days, 6 hours, 30 minutes. Any doubts about the seaworthiness of a catamaran should have been largely dispelled by this accomplishment.

The 1988 contest between *Stars and Stripes* and *New Zealand* represents merely another step in the inevitable evolution of racing yacht design and illustrates the decided inexpedience of limiting the contest to any particular hull configuration. It does not advance the interests of the sport to cling stubbornly to a concept which reflects 19th-century technology (albeit in a highly refined form) when modern theory offers an inherently superior approach. Innovation is a hallmark of America's Cup racing and, in the recent past, flexible masts, trim tabs, grooved hulls, finned keels and rigid airfoil sails have all been introduced (not, it must be added, without attendant controversy). Other innovations will doubtless follow, to the benefit of sailing enthusiasts the world over. San Diego Yacht Club should not be deprived of its victory simply because the design of its vessel was more innovative and more successful in achieving its purpose than that of the challenger Mercury Bay Boating Club.

To this end, the deed of trust should be given the liberal construction manifest in its language. Any boat which conforms to the broad eligibility requirements of the deed (a vessel, propelled by sails only, of appropriate waterline length) may be entered in the competition. The America's Cup is a "perpetual challenge cup", and therefore the deed is necessarily broadly drafted and should be broadly construed to accommodate changes which will occur over the course of centuries in both the customs and technology of yacht racing.

If Mercury Bay is aggrieved by its loss to San Diego, a remedy may be found in the same instrument which it perceives as the source of its complaint. Since the deed bars only a challenge by the same "vessel" within two years of its defeat, Mercury Bay is free to mount a new challenge with a new boat utilizing a more competitive design.

In pursuing this litigation, questions have been raised which are largely beyond the courts' cavil and which, in the long and often contentious history of America's Cup competition, have never been submitted for judicial determination. If, as they contend, the parties place such great value on the quality of sportsmanship, they cannot fail to appreciate that, between true yachtsmen, victory is pursued on the water and not in the courtroom.

KASSAL, J. (dissenting). Yachting has always been regarded as the essence of sportsmanship, and properly so. This is reflected in the spirit and venerable tradition of the America's Cup, which has long dictated that participants maintain a sense of fair play and engage in honest rivalry. These principles were violated when the San Diego Yacht Club entered a catamaran, thereby pitting a multihulled vessel against a monohull for the first time in 130 years of America's Cup competition, and virtually ensuring the latter's defeat, irrespective of the skills of its skipper and crew.

I cannot accept that such a gross mismatch was permissible under the deed of gift, which states that the Cup "shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries," and must therefore part company with the majority, which has dismissed this critical clause as mere "precatory" language.

The goal of fostering friendly competition is the condition upon which the Cup was donated. As such, it expresses an intent of the donor which must not be lost in the quest for victory, and which may not be measured solely through reference to physical dimensions.

In seeking to justify its entry of a vessel clearly intended not to compete, but solely to defeat, San Diego implies that the IAS court was misleading on the issue of the catamaran's eligibility when it rendered its prerace ruling of July 25, 1988. In fact, the court's decision explicitly noted that "the issue of whether a multihulled boat is permitted to race in the America's Cup cannot properly be determined by the Court in the context of a contempt motion," and, indeed, cautioned that nothing therein "should be interpreted as indicating the multihulled boats are either permitted or barred under the America's Cup Deed of Gift." The court went on to state that "[t]he intent of the Deed seems to be that the parties must design, build and race their boats at their own risk, subject to possible disqualification and forfeiture at the conclusion of the races."

In light of the fact that San Diego did not seek declaratory relief with respect to the eligibility of its proposed vessel, the IAS court properly declined to render what would have constituted an advisory opinion on that question. At that stage in the proceedings, the court was also correct in denying Mercury Bay's premature motion to hold San Diego in civil contempt for anticipated conduct.

On this record, it is clear that San Diego was aware that the

eligibility of its catamaran defender had not been determined in the earlier proceeding. Indeed, counsel for San Diego acknowledged the risk of disqualification—as well as the risk of forfeiture—when he stated, during the contempt motion hearing, "[I]f it appears * * * San Diego has not defended the cup in accordance with the deed then it would be appropriate for Mercury Bay to come into court and ask the Court to order a forfeiture of the cup." It so appears.

The 1988 America's Cup races were manifestly unfair in every sense. True sportmanship and the integrity of this great sport demand far more, as does the very deed of gift by which this competition has been sponsored for over a century. For these reasons, and upon the sound opinion of the IAS court, I most respectfully dissent.

MILONAS and WALLACH, JJ., concur with SULLIVAN, J. P.; RUBIN, J., concurs in an opinion; KASSAL, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on April 7, 1989, reversed, on the law, without costs and without disbursements, and a declaration made that San Diego's catamaran was an eligible yacht, that it was the winner of the two races held on September 7 and 9, 1988 for the America's Cup and that San Diego, as the winner of the two races, is entitled to the America's Cup in accordance with the terms and conditions of the deed of gift of October 24, 1887.