Hancock, Jr., J.
(dissenting). "The San Diego Yacht Club and Sail America Foundation said they would meet New Zealand on the water in a three-race series for the America’s Cup. But, San Diego officials also said they believe they have the right to set up conditions they think will make it virtually impossible for New Zealand to win” (San Diego Tribune, Dec. 3,1987 [emphasis added]).[1]
This newspaper comment frames the issue before us: was San Diego[2] faithful to its responsibilities as trustee under the New York State America’s Cup charitable trust in contriving a catamaran defense for the express purpose of turning the sailing competition into a mismatch and aborting New Zealand’s2 lawful challenge?
This is not a dispute over whether the contest between the monohull and the catamaran was a fair match. It clearly was not.[3] San Diego never intended that it should be. It conceded this point by virtually proclaiming a victory before the start of *274 the races. Indeed, Sail America’s President, Malin Burnham, publicly acknowledged in December 1987 that "the speed difference between a large multihull and any size monohull would turn this match into a farce” (emphasis added).* **[4]
From the record, there can be no doubt that San Diego chose the catamaran to race against the monohull for one reason: to be certain that there could be no reasonable possibility of losing. Its purpose was plain — to make sure that it retain the America’s Cup so that it could proceed with its plans for the 12-meter competition planned for 1990 or 1991 in San Diego.[5]
But, that San Diego concededly construed the Deed of Gift to permit its catamaran defense for the purpose of nullifying the New Zealand challenge does not, without more, end the matter. All agree that the issue is not that simple. The question is whether it was permissible for San Diego to do this. Could San Diego make this construction of the deed, as allowing a catamaran in order to foreclose any possibility of a New Zealand victory, without violating the terms of its trust and thwarting the donors’ very aim in establishing the trophy: viz., that "it shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries” (emphasis added)? Can it be consistent with the duties of a holder and defender as trustee of the America’s Cup to meet a lawful challenge by a monohull with a catamaran for the express
*275 A majority of the court concludes that San Diego’s conduct was not in breach of the trust obligations it expressly assumed under the Deed of Gift when it accepted the Cup. It adopts the argument that because there is no express language stating that a yacht must be a monohull and because the Deed of Gift refers to the yacht selected to defend against a challenger as “any one yacht or vessel”, the author of the Deed of Gift could not have intended to exclude a catamaran. Defending with a catamaran comes within the literal terms of the Deed of Gift, the majority says, and, for that reason, it concludes that San Diego has remained faithful to its trust. We disagree.[6]
The Cup donors — the record clearly shows — never conceived of a catamaran as a vessel that might be entered by either a challenger or defender in America’s Cup competition. But, that aside, it is unthinkable that the donors could ever have intended that the trophy holder and defender could construe the Deed of Gift in its favor for the express purpose of creating a mismatch to retain the trophy, thereby subverting the very purpose of their gift in trust. We therefore dissent. We would declare the September 1988 races to be nullities but permit San Diego to have a rematch, if it is so minded, in lieu of forfeiting the America’s Cup by default.
*276 I
There must be no confusion about New Zealand’s contentions or the precise issue before us. Whether San Diego’s conduct in construing the Deed of Gift so as to fix in advance the outcome of the races could, as an abstract matter of ethics, be deserving of approval is, of course, not the central point. The real question, as the majority repeatedly reminds us, involves established rules of New York trust law. Was San Diego’s unilateral construction of the Deed of Gift to permit a catamaran defense consistent with the trust obligations it agreed to undertake as the custodian of the trophy? This is the precise issue.
It is to resolve this central point and to ascertain the intent and purposes of the donors in establishing the express condition of their gift that the dominant concept of a fair match on equal terms — which is evident in the Deed of Gift and so thoroughly permeates the 130-year history of America’s Cup competitions — becomes highly relevant. For it is within the sport of international yacht racing that this charitable trust was created by the experienced yachtsmen who first won the trophy in 1851 by defeating a fleet of British yachts in a race around the Isle of Wight. No one suggests (see, majority opn, at 265, 271-272; concurring opn, at 272-273) that it would be appropriate for the courts to attempt to mediate disputes concerning racing rules or standards of what is fair or appropriate in the actual conduct of yacht races. But certainly the long-accepted general notions of fair competition in yacht racing — and, indeed, the obvious point that sailing two mismatched boats against each other is not a race but a pointless exercise— are significant. They help to determine what the yachtsmen who established the trust had in mind in donating the America’s Cup "upon the condition that it shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries” (emphasis added).
And let there be no mistake about this. Contrary to the implications of the majority (at 262-263) and concurring (at 272) opinions, the dispute is not about the propriety of New Zealand’s conduct in issuing its challenge. Supreme Court, in a prior proceeding, held that the 90-foot monohull fully conformed with all requirements of the Deed of Gift. In the same proceeding, Justice Ciparick dismissed any suggestion that New Zealand should have adhered to the recent pattern of 12-meter competitions and rejected San Diego’s efforts to have *277 the Deed of Gift amended to reflect such requirement (see, Mercury Bay Boating Club v San Diego Yacht Club, Sup Ct, NY County, Nov. 25, 1987, Ciparick, J., CA 72, JA 821; CA 81-82, JA 830-831). Justice Ciparick, in her decision, noted, moreover, that although "San Diego has declined to negotiate with the challenger, Mercury Bay expresses its willingness to participate in a multi-national elimination series, in 1988 using ninety footers, for the right to challenge for the cup and to negotiate other terms”. (Emphasis added.) San Diego chose not to appeal Justice Ciparick’s rulings. The challenge by New Zealand was unquestionably proper in every respect.[7]
Finally, before turning to the merits of the appeal, a comment must be made concerning one other point raised by San Diego. It argues (and the majority appears to give the argument some credence [majority opn, at 266]) that the dispute over interpretation of the Deed of Gift should have been referred to an international jury of "IYRU-certified racing Judges of vast experience and international repute” (id., at 266) and that the propriety of races between monohulls and multihulls vessels is not a question "suitable for judicial resolution.” (Id., at 272.) There is simply no support for this argument in the Deed of Gift or elsewhere. The suggestion that a jury of yachtsmen would be the appropriate forum for deciding a question pertaining to the construction of a trust instrument established under New York’s charitable trust law is, we *278 believe, best answered in the legal brief submitted jointly on behalf of the amici curiae, renowned yachtsmen from the United States, Great Britain and Australia and yacht clubs of undisputed standing:[8] "First, it is important to bear in mind that the issue here is not whether one vessel or another cut inside or outside a marker. The courts are not being asked to decide whether a foul was committed or to second guess on-the-spot officials by affording the loser a judicial 'replay’ of a particularly close finish. Such issues are and should be left to the yachting officials. The issue in this case goes to the fundamental nature of the America’s Cup competition and calls for a judicial construction of a trust instrument which SDYC accepted with the express understanding that the 'Deed of Gift shall be governed by, and construed in accordance with’, the laws of New York and that 'any proceeding for amendment or interpretation of such terms and conditions [would] be brought before the courts of the State of New York.’ ” (Amici brief, at 25, n 11 [emphasis added].)
II
The holder and defender of America’s Cup acts as a trustee. In setting the time and place for the races, in establishing the rules, the courses and other conditions for the competition and in construing the Deed of Gift to decide upon a proper boat to meet the challenger, the defender must act in all respects with nothing less than irreproachable fairness. A defender owes a duty as trustee to any yacht club which may file a challenge against it. But it owes a duty as well to past defenders and trustees of the America’s Cup, those who have engaged in America’s Cup competitions and to interested members of the international yacht racing community. All have a legitimate concern that an America’s Cup challenge be administered in a way that is fully consistent with the underlying concept of maintaining "a perpetual Challenge Cup for friendly competition between foreign countries”.
The standards governing the conduct of an America’s Cup *279 defenders are those which apply to trustees generally. The classic statement of the standard is that of Chief Judge Cardozo in Meinhard v Salmon (249 NY 458, 464) (quoted by the majority, at 270), "[n]ot honesty alone, but the punctilio of an honor the most sensitive” (see generally, Restatement [Second] of Trusts § 170; 2A Scott, Trusts §§ 170, 170.25 [Fratcher 4th ed]). But, as with any legal duties involving standards of ethics and integrity, it is difficult to define the defender’s responsibilities as trustee in other than general terms. There are, nevertheless, aspects of the defender’s role as trustee which are particularly instructive. First, of course, the defender’s duty as trustee arises in a sport — a context totally foreign to the circumstances where "the morals of the market place” prevail (see, Meinhard v Salmon, supra, at 464). As put by A. Bartlett Giamatti, "the basic convention for any game is the assumption of a level field, that all begin as equals, above board. Without that convention, there is no contest. * * * The highly moralized (because rule bound) world of any sport is very fragile in the face of the amoral quest for betterment, the hunger to win at any cost, even at the cost of destroying the game”.[9]
Second, the defender’s role is made more sensitive and its actions subjected to a stricter scrutiny because it is a competitor as well as a trustee (see, 2A Scott, Trusts § 170.25 [Fratcher 4th ed] ["(a) trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever his personal interest comes or may come into conflict with his duty to the beneficiaries” (emphasis added)]; see generally, Restatement [Second] of Trusts § 170). In managing the race, construing the Deed of Gift and selecting a proper defending boat the defender is a trustee. Once the first warning gun of the race goes off, the trustee becomes a competitor. The decisions which the defender makes as trustee will obviously affect the ensuing competition, even predetermine it. It would, at the very least, be contrary to the accepted standards of ethics in any sporting event for a competitor, in a position to make a unilateral rule interpretation affecting his opponents’ competitive positions, to bend the rule or stretch the language to virtually assure victory for himself.
It is on the dual role of the America’s Cup holder as first a *280 trustee and then a competitor that we have a sharp disagreement with the majority. The majority view, apparently, is that the holder-defender in deciding upon a proper boat to meet a challenge is perfectly free, in its role as a competitor, to adopt an adversarial approach in construing the Deed of Gift for the purpose of defeating the challenge without the constraints of its trust obligations.[10] Thus, it concludes that San Diego’s "anything goes” policy in giving the Deed of Gift a constricted reading designed to make New Zealand’s victory "virtually impossible” was proper. The majority’s conclusion is based on a proposition of law for which no precedent has been found.
Although agreeing that Meinhard v Salmon (249 NY 458, supra) states the rule (majority opn, at 270), the majority fails to follow it. Instead, it holds that it is "inappropriate and inconsistent with the competitive trust purpose to impose upon the trustee of a sporting trust such as this one the strict standard of behavior which governs the conduct of trustees who are obligated not to compete with the trust beneficiaries.” (Id., at 271 [emphasis added].) No authority is cited for this proposition. But, that aside, the America’s Cup trust is not a so-called "sporting trust” (compare examples of false charitable trusts for "the mere promotion of sports” [4A Scott, Trusts § 374.6A (Fratcher 4th ed); Restatement (Second) of Trusts § 374, comment n, at 262]). There is no question that the America’s Cup trust is a valid New York charitable trust. Indeed, the majority points out that no one disputes this (majority opn, at 271, n 4). Nevertheless, the majority offers no explanation of why, in assessing the conduct of this trustee, there should be any deviation from the general rules which would otherwise apply — particularly the rule fixing the very strict standard when the trustee’s own interest comes into conflict with the duty owed to the beneficiaries (see, 2A Scott, Trusts § 170.25 [Fratcher 4th ed]).
The provisions of the trust, contained in the amended Deed of Gift of October 24, 1887 signed by Mr. George Schuyler — in three explicit instructions — leave no doubt as to the purposes for which the holder and defender of America’s Cup must carry out its responsibilities (see generally, Restatement [Second] of Trusts § 164, comment a; 2A Scott, op. cit., § 164.1). *281 Two of these instructions are set forth in the key sentence expressing the condition of the gift: "This Cup is donated upon the condition that it shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries” (emphasis added).
The condition of the gift has two components: (1) that the Cup "shall be preserved as a perpetual Challenge Cup”, and (2) that it be preserved "for friendly competition between foreign countries”. The words "shall be preserved” are mandatory, not precatory (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 171; Spencer v Childs, 1 NY2d 103, 106-109). It seems self-evident that a defense of the Cup which is calculated to circumvent a lawful challenge and to avoid any competition would flatly contradict these two instructions.
The third instruction is that a challenger "shall always be entitled to the right of sailing a match for this Cup” (emphasis added). Again, the language is mandatory, and again, it seems self-evident that a defender cannot act deliberately to prevent "a match” without violating this unequivocal mandate.
There exists compelling evidence of how the original donors intended that the Deed of Gift should be interpreted and the trust carried out. In a letter dated April 15, 1871, George Schuyler, an original America’s Cup donor and the signer of the 1887 amended Deed of Gift, ruled that the Deed of Gift did not permit a defending yacht club to defend against a challenge by racing a fleet of yachts against a challenger’s single yacht. The ruling was made in connection with a rematch against the New York Yacht Club sought by Mr. James Ashbury of the Royal Thames Yacht Club. Mr. Ashbury’s first challenge in 1870 in his yacht Cambria had been met by the New York Yacht Club with a fleet of 14 defending yachts. Cambria had finished 10th. In connection with his 1871 challenge Mr. Ashbury sought a ruling — which the New York Yacht Club opposed — that a "fleet defense” would not be permitted and that the race would, instead, be one-on-one (see, affidavit of James Michael, Appdx, vol II, at CA 843-845, JA 2292-2294; Rousmaniere, The Mismatch Question and the America’s Cup, at CA 766, JA 2056). Although there was nothing in the deed precluding such a "fleet defense”, Mr. Schuyler left no doubt that the instrument would not permit what he viewed as an unacceptable effort by the defending New York Yacht Club to retain the America’s Cup at all costs. *282 Mr. Schuyler stated: "It seems to me that the [position of the New York Yacht Club] renders the America’s trophy useless as 'a Challenge Cup’, and that for all sporting purposes it might as well be laid aside as family plate. I cannot conceive of any yachtsman giving six months’ notice that he will cross the ocean for the sole purpose of entering into an almost hopeless contest for this Cup” (emphasis added). (Letter of George Schuyler, Spirit of the Times, Apr. 15, 1871, at CA 514, JA 1318.)
In resolving the controversy and holding that the Deed of Gift contemplated only a "one-on-one” competition — despite the absence of any limiting language — Mr. Schuyler held that "match” means "one side against the other side” (CA 507, JA 1311). But, significantly — although, not necessary to settle the precise dispute before him — Mr. Schuyler set forth his complete definition of "match” in which he included the underscored words which follow: "but the cardinal principle is that, in the absence of all qualifying expressions, 'a match’ means one party contending with another party upon equal terms as regards the task or feat to be accomplished” (emphasis added). These words — of critical importance in the instant controversy —can mean only that, in Mr. Schuyler’s mind (and in the minds of the original donors), a race to be considered a "match” as contemplated in America’s Cup competition would have to be one which was fair and on equal terms.
That the notion of a fair match on equal terms is inherent in the concepts of a "Challenge Cup” and "friendly competition between foreign countries” is confirmed by the history of America’s Cup races. In the 26 matches conducted since the original gift in 1857, the competing yachts have borne a close resemblance to each other with each vessel having a reasonable chance to win. In all of the races until 1988, the defenders and challengers have been monohulls. With the exception of the challenge in 1870 (the year of the controversial "fleet defense” victory over the British yacht Cambria), the defenders and the challengers have been of virtually the same length on the waterline.[11]
*283 Again, in 1887, George Schuyler — in his handling of another problem that had arisen in connection with a challenge— underscored the dominant theme of his 1871 letter: that the governing principle of America’s Cup competition is fairness, that a race between a challenger and defender for the “Challenge Cup” should be a fair match on equal terms. When the Scottish challenger Thistle arrived in New York for her challenge against the New York Yacht Club, it measured 1.4 feet longer on the waterline than had been represented, giving it a speed advantage over the defending yacht which had been built to match the shorter length. Although George Schuyler chose not to disqualify Thistle, he gave her a time handicap to make it a fair match on equal terms.
In 1890, another noted New York yachtsman reemphasized the recurring theme of fairness. Joseph Busk, who had served on the New York Yacht’s Club America’s Cup committee, in explaining the 1887 Deed of Gift in reply to a letter from the Earl of Dunraven which had criticized it, wrote: “In drawing the new rules the idea was to eliminate, as much as possible, the chance of the Cup being won or held by trick, device or surprise and to make it a trophy to be won by fair sailing in a match between the best representative boats that could be produced by either side” (CA 787, JA 2077 [emphasis added]).[12]
Ill
It is basic that a trustee is legally bound to carry out its trust solely for the interests of the beneficiaries (see, Restatement [Second] of Trusts § 170 [1]; 2A Scott, op. cit., § 170). Ordinarily a court will not inquire into the motives of the trustee. But, if it is shown that its motives were improper the court will intervene. Thus, “if the trustee in exercising or failing to exercise a power does so because of spite or prejudice or to further some interest of [its] own or a person other *284 than the beneficiary, the court will interpose” (Restatement [Second] of Trusts § 187, comment g, at 404 [emphasis added]; see, Matter of Bruches, 67 AD2d 456, 462; 2A Scott, op. cit., § 170.25). It is in the light of these rules that San Diego’s conduct as trustee must be examined.
In deciding whether San Diego has acted properly in construing the Deed of Gift to permit its catamaran defense, we must not analyze the language as if it were contained in a contract drawn between two parties dealing at arm’s length. We must construe the Deed of Gift as a trustee should construe it. The question is whether San Diego — charged with acting solely for the interest of the beneficiaries and not for its own interests — has fairly and objectively construed the language of the Deed of Gift.
The question is not the hypothetical one of whether under any circumstances a catamaran could be permitted — e.g., whether a challenger could test the Deed of Gift by making a challenge with a catamaran. The challenging yacht club is not a trustee; only the defending yacht club is. Only the defender must act with the objectivity required of a trustee. Thus, resolution of the decisive issue — whether the Deed of Gift has been properly construed — depends not on whether the Deed of Gift can be read to encompass a catamaran but on whether San Diego, as trustee, ought to have read it that way. In other words, could San Diego give it a literalistic and narrow construction so as to permit itself to defend with a catamaran against a monohull without violating the trust?
Forget, for the moment, the defender’s obligations as trustee and ignore everything in the Deed of Gift except the fifth and sixth paragraphs dealing with yacht dimensions and notice requirements. Even then, the conclusion is inescapable that a catamaran as a putative America’s Cup contender could not have been contemplated. The only dimension restriction is one that can have no relevance to a catamaran: length on the load waterline (not less than 44 feet, nor more than 90 feet for a single-masted yacht). No one can seriously dispute the proposition that water-line length serves as a rough measure for the hull speed of a monohull sailing vessel, but does not do so for a catamaran. (See, supra, at 282-283, n 11, regarding rule-of-thumb — hull speed in knots of monohull equals square root of twice load water-line length in feet.)
For many reasons, this relationship of water-line length to hull speed does not apply to catamarans. For example, the *285 twin hulls of the catamaran can be long, narrow and widely spaced. Because it can achieve its necessary stability from the wide-spacing of its two hulls, a catamaran can be much lighter than a monohull (e.g., 75,000 pounds for monohull New Zealand as contrasted with 6,000 pounds for the catamaran Stars and Stripes). And because of their long, narrow shape, the two hulls create considerably less wetted surface than would be the case for a comparable monohull. The result is that the catamaran has a vastly superior power to weight ratio, and far less drag. Also, of course, a catamaran has the additional advantage of being able, under certain conditions, to lift one hull from the water (i.e., to "fly a hull”), thereby reducing drag even further and increasing speed.[13]
But the very facts in this case provide the ultimate proof of the proposition that the general relationship between load waterline and hull speed does not hold true for catamarans. San Diego, knowing that New Zealand measured 90 feet on the load waterline, built a catamaran of 60 feet, 30 feet shorter, yet was assured that the race would be "no contest”. The catamaran’s speed potential was estimated at more than 22 knots.[14] Applying the monohull rule-of-thumb to the 60-foot catamaran produces the figure 10.95, a mathematical result without any nautical, physical or other significance.
The requirements in the 1887 amended Deed of Gift, signed by Mr. Schuyler, that the challenger must give the defender 10 months’ notice of its load water-line length and that the challenger’s yacht may not exceed that length (reflecting Mr. Schuyler’s experience in the Thistle controversy) serve the obvious purpose of giving the defender definite and binding advance notice about the challenger’s speed so that it can construct a defending yacht of comparable size and capability. Indeed, George Schuyler, in his letter of September 24, 1887 referring to the Thistle controversy, emphasized the great "importance of accuracy in giving the dimensions [i.e., water *286 line length] of a yacht challenging for the Cup” (Appdx, at CA 1004, JA 2562 [emphasis added]). But the requirement for specification and notification of load water-line length would have had no "importance” and no meaning if considered applicable to catamarans. It can hardly be thought that Mr. Schuyler, a lawyer and yachtsman of unquestioned competence, would have sanctioned the drafting of a provision which could have served no purpose.[15]
Another provision in the 1887 Deed of Gift specifically permits "centre-board or sliding keel vessels” and prescribes that there be no limitation "upon the use of such centre-board or sliding keel” and that "the centre-board or sliding keel” shall not be considered a part of the vessel for measurement purposes. It is a reasonable inference from the fact that "centre-board or sliding keel” is invariably referred to in the singular that the drafter had in mind a vessel with one hull, using one centre-board or sliding keel, not a catamaran having two hulls and two centre-boards or sliding keels.
San Diego, in dismissing these undeniably compelling signs that only monohulls were contemplated, relies almost entirely on the reference in the October 24, 1887 amended Deed of Gift to the defender’s yacht as "any one yacht or vessel constructed in the country of the Club holding the Cup” (emphasis added). In its argument, San Diego rejects the primary meaning[16] of the word "any” and the sense in which it clearly appears Mr. Schuyler, who added it, intended that it be understood — i.e., as limiting the defending yacht club to a defense by only "one” yacht as opposed to more than one (see, discussion, infra, at 287-288). Instead, San Diego adopts a secondary meaning[17] of "any” *287 and reads the word as signifying that there should be no limit on the types or kinds of yachts or vessels chosen to meet a challenger and that Mr. Schuyler, therefore, must have intended that the phrase "against any one yacht or vessel” be read broadly to include catamarans.
Nothing in the Deed of Gift or its history suggests that Mr. Schuyler thought that the word "any” would ever be understood as having some relation to the types or kinds of vessels or that the word would be given a meaning other than its primary one. On the contrary, the history of the amendment of the Deed of Gift shows conclusively that San Diego’s construction is wrong. Mr. Schuyler used the word "any”— juxtaposed in the added phrase with the word "one” — in its primary and restrictive sense to mean one yacht or vessel as opposed to more than one. The phrase "against any one yacht or vessel” (emphasis added) was added by Mr. Schuyler solely to assure that future America’s Cup defenses would be in a single yacht, thus preventing any possibility of another attempted "fleet defense” of the type the British challenger Cambria had been forced to meet in 1870. (See, supra, at 281-282; Letter of George Schuyler, Spirit of the Times, Apr. 15, 1871, at CA 505, 514, JA 1309,1318.)[18]
San Diego goes to great lengths to make it appear that in this country in the late 19th century catamarans were customarily accepted as competitors in ocean yacht racing. The unrefuted record demonstrates just the contrary. Catamarans were small, largely experimental and certainly not generally accepted in established yacht races. Indeed, the research reveals that only 48 catamarans existed in this country between 1820 and 1890. (See, affidavit of Daniel Charles, at CA 590-598, JA 1491-1499.)[19] What is clear, moreover, is that *288 catamarans were never considered in connection with America’s Cup races. Indeed, in the 19th century they were too small and not sufficiently seaworthy to make the open ocean voyage which would ordinarily be required to get to the site of the race.[20]
It adds nothing to note (majority opn, at 269) that the dimension specifications in the Deed of Gift would theoretically permit the absurd spectacle of a 44-foot monohull racing against a much faster 90-foot monohull. Obviously, the argument is not germane to the question of whether the Deed of Gift permits a catamaran. Beyond that, if the point is that the Deed of Gift would permit a defender to assure its victory by overwhelming a smaller monohull with a larger and faster monohull, the argument overlooks the point that the defender is trustee. One could hardly suggest that such conduct would promote "friendly competition between foreign countries”. The history of America’s Cup, of course, proves that such an obvious mismatch created by a defender would never have been tolerated.[21]
The foregoing (and the balance of the evidence in this voluminous record), we are convinced, confirms that the Deed of Gift, in its original and amended forms, contemplated only monohulls. But, even if that issue were much closer, the critical question would remain. Did San Diego, in resolving the disputed issue in its own favor, adhere to the "very high and very strict standard [which the courts have fixed for the conduct of a trustee] whenever [its] personal interest comes or may come into conflict with [its] duty to the beneficiaries”? (Emphasis added; 2A Scott, Trusts § 170.25 [Fratcher 4th ed].) *289 We believe that, based on facts in the record which are either conceded or not seriously controverted and on established rules of New York trust law, the answer must be "no”. The following analysis demonstrates why.
Under settled principles of trust law (see, e.g., Restatement [Second] of Trusts § 187, comment g, at 404), it would ordinarily follow that San Diego’s construction of the Deed of Gift for its own purposes so as to permit a catamaran defense would make it liable for breach of its trust. San Diego argues, however, that the fact that it acted for its own interests is irrelevant because its construction of the Deed of Gift was unquestionably correct. In effect, it contends that it did the right thing, although, perhaps, for the wrong reasons. This is obviously its posture in contending that the "any one yacht or vessel” clause gives it a total license as to the type of vessel and that it, therefore, had the absolute "right to set up conditions [it believed would] make it virtually impossible for New Zealand to win” (emphasis added; comment, San Diego Tribune, Dec. 3,1987, supra, at 273; see, similar comments and expressions in nn 3, 4 and 5, supra, at 273-274).
Thus, the question ultimately comes to this: was San Diego’s choice of the catamaran a cut-and-dried decision made as a matter of routine? Is San Diego correct in construing the Deed of Gift as giving it the power to stifle any chance of a New Zealand victory by choosing a catamaran defense? In no sense, regardless of any of San Diego’s arguments on the Deed of Gift, was the question cut-and-dried or the choice a matter of routine. Under any reasonable view, San Diego would have to concede the existence of ambiguity in the Deed of Gift on the question of permitting a catamaran defense and substantial doubt as to the correctness of its construction. At the very least, the decision required San Diego to exercise reasoned judgment which "could typically produce different acceptable results” (Tango v Tulevech, 61 NY2d 34, 41) — i.e., a judgment, as trustee, that was quasi-judicial in nature. Because, as trustee, it could make decisions of competitive advantage to itself and disadvantage to challenger-beneficiaries, it was bound to adhere to the "very high and very strict standard” which the law imposes (see, 2A Scott, op. cit., § 170.25).
San Diego, in making a rigid and overly literal construction of the Deed of Gift, did so for its own interest and contrary to the interests of the beneficiaries. San Diego, therefore, violated its duty as trustee under the Deed of Gift in defending *290 with a catamaran, and should not have been declared the winner of the two races.
IV
At the root of this appeal, we submit, is a fundamental disagreement as to the standards by which San Diego’s conduct as trustee should be measured. San Diego has obviously applied the standard "of the market place” (Meinhard v Salmon, supra, at 464) in assuming, as it did, that it was completely justified in adopting an "anything goes” interpretation of the Deed of Gift for the purpose of making it "virtually impossible for New Zealand to win”. Thus, without hesitation, San Diego has adopted its rigid construction of the "against any one yacht or vessel” clause. It has consistently approached the case as though it involved a dispute over the meaning of a business contract made between two parties at arm’s length. San Diego’s attitude, we believe, is epitomized in a statement given by Dennis Conner to Life Magazine concerning his assessment of America’s Cup competition: " 'Sportsmanship is nonexistent. This isn’t tiddlywinks; it’s business * * * there has never been any sportsmanship in the America’s Cup. Anyone who thinks so is kidding himself.’ ” (Article, No Match America’s Cup 1988, at CA 971, JA 2515 [quoting Life Magazine, Sept. 1989].)[22]
There are certainly those who, like Mr. Conner, believe that America’s Cup has become a business, even one debased by "greed, commercialism and zealotry” (see, concurring opn, at 272). Perhaps, the reality is that it has come to that. Still, there are those who believe that America’s Cup remains and should remain a sporting event in the accepted tradition where "identical conditions and norms [are imposed] upon play, [and] the essential assumption of all the rules is that skill or merit * * * will win out” (Giamatti, Take Time for Paradise: Americans and Their Games, at 60 [Summit Books 1989]). Whether the more cynical assessments of America’s Cup are correct is for the yacht racing community and public to decide.
But, irrespective of one’s attitude toward America’s Cup competition, one thing is certain: the standards of "the mar *291 ketplace” cannot be the measure of San Diego’s conduct as defender and as a trustee under New York law. San Diego and New Zealand cannot be viewed as parties who are in dispute over some terms in a bargained-for agreement. One is a trustee, the other is not. It is the law of trusts which applies, not the law of contracts.
It is this critical aspect of San Diego’s role as holder and defender of America’s Cup and its attendant obligations as trustee which the Attorney-General overlooks in his criticism of the trial court for her application of a "different standard in assessing the propriety of San Diego’s defense than it did in evaluating Mercury Bay’s initial Notice of Challenge” (emphasis added; brief of Attorney-General, at 28). Indeed, the majority rejects this same crucial distinction in its comment that because San Diego considered New Zealand’s monohull to be "unorthodox”, San Diego’s conduct was fully justified when it "responded to Mercury Bay’s competitive strategy [i.e., its legal monohull challenge] by availing itself of the competitive opportunity afforded by the broad specifications in the deed.” (Majority opn, at 269 [emphasis added].)
But, Justice Ciparick was quite correct in holding San Diego to the higher standard in "assessing the propriety of [its] defense”, for only San Diego was a trustee. When it won the America’s Cup at Freemantle in February 1987, San Diego formally agreed to accept it in trust pursuant to the following provision in the Deed of Gift: "[San Diego] hereby accepts the said Cup subject to the said trust, terms, and conditions, and hereby covenants and agrees to and with the said party of the first party that it will faithfully and fully see that the foregoing conditions are fully observed and complied with” (emphasis added).
Judge Titone and I would "impose a duty on the defender to —well, to do just what?”, the concurrer asks (concurring opn, at 272). This question as to San Diego’s duty is, of course, the critical one. We think it has been clearly answered. As trustee under the Deed of Gift, San Diego had the legal duty to meet the "very high and very strict standards” which the law imposed upon it because, in its dual role as competitor and trustee, its interests were in conflict with the interests of the beneficiaries, including the challenger (see, 2A Scott, Trusts § 170.25 [Fratcher 4th ed]). It is this duty which San Diego ignored in adopting a constricted reading of the "any one yacht or vessel” clause to sanction its choice of a catamaran and assure New Zealand’s defeat.
*292 V
There remains the question of appropriate relief. In our opinion, the races held on September 7 and September 9, 1988 should be declared nullities. San Diego should not, however, be held to have automatically forfeited the America’s Cup. The matter should be remanded to Supreme Court for the purpose of fashioning an order which would give San Diego a reasonable period of time, if it so desires, to arrange for and conduct a new series of races in which it can meet the New Zealand challenge in a defending yacht or vessel which complies with the Deed of Gift. In the event that San Diego does not avail itself of this option, it should be considered to have defaulted in the face of New Zealand’s lawful challenge and the America’s Cup should be awarded to the Mercury Bay Boating Club Inc. We believe this outcome is compelled, under the circumstances, by notions of fairness, considering particularly: (1) that the September 1988 races were held pursuant to an order of Supreme Court without a ruling as to the legality of the catamaran defense, and (2) that San Diego’s interpretation of the Deed of Gift was approved by the New York State Attorney-General.
Chief Judge Wachtler and Judges Simons, Kaye and Bellacosa concur with Judge Alexander; Chief Judge Wachtler concurs in a separate opinion; Judge Hancock, Jr., dissents and votes to reverse in another opinion in which Judge Titone concurs.
Order affirmed, with costs.

. (Appdx, vol I, at CA 437, JA 1157 [cited in Mercury Bay brief on app, at 18].)

. "San Diego” will be used throughout to refer to San Diego Yacht Club, Inc. and to groups or individuals directly associated with it such as Sail America Foundation, Manager of San Diego Yacht Club’s America’s Cup defense.
"New Zealand” will be used to refer to the challenger, Mercury Bay Boating Club Inc., and persons or groups directly associated with it such as Michael Fay, head of the New Zealand Yachting Group and the monohull’s chief backer.

. The catamaran won the first race by 2 Vi miles and by 18 minutes, 15 seconds; the second race by more than four miles, and by 21 minutes, 10 seconds. The overwhelming consensus of opinion was that it was "one of the greatest mismatches in history” (Poe, A-Cup XXVII, Santana, Oct. 1988, Appdx, vol II, at CA 959, JA 2503; see, similar comment of Frank Snyder, Commodore of New York Yacht Club, Appdx, vol II, at CA 755-756, JA 2045-2046). Moreover, the post race consensus was that the catamaran had not been sailed to its speed potential. David Poe who followed the catamaran in the press boat observed that "Dennis [Connor, the Skipper of Stars and Stripes,] did a lot of dawdling on the race course to make it look close * * * [and that] it was obvious that Dennis was frequently pointing too high, even *274 luffing his jib and the instant the hull came out of the water, plop back down it went” (A-Cup XXVII, Santana, Oct. 1988, id., at CA 959, JA 2503; see, Mercury Bay brief on app, at 22-24, for similar observations, for editorial comments, and for other relevant record citations).

. San Diego Union, Thurs., Dec. 3, 1987 (Appdx, vol I, at CA 433, JA 1153). (See also, comment of Dennis Conner, Skipper of Stars and Stripes, made in USA Today, Sept. 9, 1988 that ”[t]he catamaran is a tool to deal with the problem — an unwanted problem” [id., at CA 1037, JA 2826]; comment of Britton Chance, a member of San Diego’s Design Team: "The ability to beat the monohull with a multi-hull would not be an issue. The multi-hull is going to win every time barring bad design, bad construction or bad execution.” [Providence Journal, Dec. 23, 1987, id., vol I, at CA 441, JA 1167].)

. Malin Burnham could not have been more frank in announcing the San Diego group’s overriding objective: "If we have to race Fay [the chief backer of the New Zealand] in 1988, we want to be sure we can put his challenge away with little trouble. We don’t want to do anything to risk San Diego losing the 1991 series.” (Sports Illustrated, Dec. 7, 1987, Appdx, vol I, at CA 331, JA 1012.) (For references to additional similar comments see, Mercury Bay brief on app, at 18.) *275 purpose of avoiding the very competition which the gift of the Cup was intended to promote?

. The concurrence misreads the dissent as maintaining that the court should impose some undefined duty on the defender "in the interest of sportsmanship and tradition” — a duty to "not try too hard to win, it seems.” (Concurring opn, at 272.) This is not the position of the dissent and plainly not what it says. As is fully apparent (see, e.g., infra, at 275), the position of the dissent is that San Diego had a legal duty as trustee of the America’s Cup — a valid New York State charitable trust — to make a fairly considered and unbiased construction of the Deed of Gift in its selection of a defending yacht. It is whether San Diego violated this legal duty — not some dispute over ethics in sports or racing rules or what would "ensure a 'close’ race” (concurring opn, at 272) — which is the central question. The position of the dissent is simply stated: San Diego violated its duty as trustee in deliberately construing the Deed of Gift for its own benefit so as to permit a catamaran defense for the express purpose of avoiding the very competition for which the donors established the America’s Cup trust. There is no disagreement that "elemental legal principles” (concurring opn, at 272] dictate the outcome of this case. Our disagreement is over what these principles are and how they should be applied. It is the question of San Diego’s legal duty under the New York law of trusts — irrespective of its importance to society or to the law as a precedent — which we must decide. It is solely this question we address.

. San Diego, nevertheless, persists in its efforts to cast doubt on the propriety of New Zealand’s conduct, suggesting that New Zealand’s departure from the 12-meter format of recent years, while concededly legal, was somehow improper. The suggestion apparently viewed with some favor by the majority (majority opn, at 262-263, 269) is surprising in view of Justice Ciparick’s unappealed decision, in which she stated, inter alia, that it "is not at all clear that a challenge involving ninety footers would be more expensive than racing in twelve-meter yachts” and that "it appears that ninety footers may be ideal and twelve-meter boats ill-suited for a competition to be held in San Diego with its light winds”. The suggestion is all the more surprising in view of the letter to Fred Frye, Commodore of the San Diego Yacht Club, sent by James Michael before San Diego decided on a catamaran (CA 176, JA 122; CA 177, JA 123) stating, in part, that "a match between two 90-foot load water-line yachts surely comes closer to the contemplation of [the donor,] George L. Schuyler * * * than do 12-meters” and that such a match "could be every bit as competitive as one between two 12-meters, and very likely would be of much more worldwide interest, considering that the yachts could be expressly designed for the San Diego conditions”. James Michael, among other things, is past commodore of the Cruising Club of America, past president of the U.S. Yacht Racing Association and a former trustee of the New York Yacht Club who served on its America’s Cup committee from 1971 to 1983.

. The final list of amici included the following: Robert N. Bavier, Jr.; John Bertrand; Alan Bond; Courageous Sailing Center of Boston, Inc.; William P. Ficker; Sir James Hardy; Frederick E. "Ted” Hood; Gordon Ingate; Ischoda Yacht Club, South Norwalk, Connecticut; Warren Jones; Arthur Knapp, Jr.; Graham Mann; Robert W. McCullough; Emil "Bus” Mosbacher, Jr.; Noel Robbins; Jock Sturrock; and Ted Turner.
Among these amici are nearly all of the skippers of both the challengers and the defenders in the matches held since World War II.

. Giamatti, Take Time for Paradise: Americans and Their Games, at 62-63 (Summit Books, 1989).

. See, e.g., the majority’s statement that San Diego was justified in responding to the challenge "by availing itself of the competitive opportunity afforded by the broad specifications in the deed.” (Majority opn, at 269 [emphasis added].)

. The importance of having closely matched load water-line lengths in racing monohulls is that the length on the load waterline of a monohull keel yacht bears a direct relationship to its hull speed. An accepted rule-of-thumb is that the square root of twice the load water-line length of a monohull keel yacht in feet is approximately equal to the yacht’s hull speed in knots. For example, for a yacht with a load water-line length of 32 feet, the hull speed is approximately equal to the square root of 64, or 8 kts.
*283 Except for four occasions during the history of America’s Cup from 1870 until 1958, when the 12-meter competitions began, the defenders were shorter on the waterline than the challengers. In the case of the four exceptions, the defenders were very slightly longer (see, chart of dimensions of America’s Cup defender and challenges from 1870-1983, Appdx, at CA 879-882, JA 2387-2390).

. Joseph Busk, commenting on the concept that most matches would be held under the "mutual agreement clause” also stated in his letter to the Earl of Dunraven: "the whole of the present deed hinges on this idea as it was never supposed that any club would refuse to make a fair sporting match” (CA 788, JA 2078 [emphasis in original]).

. See, Mr. Justice Rubin’s succinct explanation in Mercury Bay Boating Club v San Diego Yacht Club (150 AD2d 82, 106-107 [Rubin, J., concurring]; see also, affidavit of John Brian Shuttleworth [CA 992, 996, JA 2536, 2540]).

. See, e.g., Ballard, Sailing Back to the Future, Sports Illustrated, Dec. 7, 1987, at CA 330, JA 1011; see also, article, The America’s Cup — An Irish Joke, at CA 394, JA 1112; article, " 'Time’s a Wasting,’ ’’Says Designer of U.S. Cup Defender, Providence Journal, Dec. 13, 1987, at CA 441, JA 1161; article, Counterpoint: The Views of Dick Newick, Sailing World, Mar. 1988, at CA 387, JA 1105; article, Mono vs. Multi: An America’s Cup Scenario, Sailing World, Apr. 1988, at CA 390, JA 1103).

. It is, of course, the identity of the dimension which the Deed of Gift specifies — i.e., length on the load waterline — and the importance attached to the accurate submission of this dimension which are so highly relevant and helpful on the question of whether catamarans were contemplated. Because this "important” load water-line dimension has meaning when applied to monohulls but none when applied to catamarans, it seems evident that catamarans were never considered. It is of no significance to this central point that only the challenger is required under the Deed of Gift to give notification of the dimensions of the challenging yacht and that, of course, only the challenger is bound by the dimensions it submits to the defender (see, majority opn, at 268; see, discussion, infra, at 288).

. The primary definition of "any” in Webster’s New 20th Century Dictionary, Second Edition is: "1. one (no matter which) of more than two; as any boy may go.”

. The secondary definition of "any” in the Webster’s New 20th Century Dictionary, Second Edition is: "2. some (no matter how much, how many, or what kind); as, do you have any apples?”

. The Schuyler letter of April 15, 1871 establishes beyond doubt that the only purpose of adding the phrase "against any one yacht or vessel” was to clarify what Mr. Schuyler thought was already implicit in the original Deed of Gift — that one challenger should race against one defender. Indeed, it appears from that letter that Mr. Schuyler in 1871 thought that adding the words in the phrase "against any one yacht or vessel” (later added to the Deed of Gift in 1887) "would have been unnecessary and superfluous” (CA 506, JA 1310 [emphasis added]).

. John Rousmaniere, a yacht historian, writing in Sailing World stated that "there is every reason to believe that George Schuyler would have found the prospect [racing multihulls in America’s Cup competition] ludicrous both then and now. First, the legal standing of multihulls as racing yachts was severely questioned in the 1870’s and after. While multihulls were not unknown in European and American yachting before then, they *288 were not considered anything more than experimental toys until Nathanael Herreshoff turned up at some Long Island Sound regattas in 1876 in his ingenious 25-foot LOA cat Amaryllis. * * * [e]ven proponents of catamarans admitted that they were dangerous in rough water. Certainly they were not seaworthy enough to cross an ocean to sail in a Cup match” (emphasis added). (See, CA 334-335, JA 1047-1048.)

. See, references in Schuyler letter, April 15, 1871, to the necessity for challengers to make ocean crossings (CA 510, JA 1314; CA 512, JA 1316; CA 514, JA 1318; majority opn, at 262 [Deed of Gift was amended in 1956 "to eliminate the requirement that the challenging vessel sail to the match 'on its own bottom’, a requirement that had disadvantaged foreign challengers”]; comment of yacht historian Rousmaniere, underscored last sentence, n 19, supra).

. See, discussion of the Thistle challenge, supra, at 283; see also, history of America’s Cup challenges, supra, at 281-282; Chart of Dimensions of America’s Cup Defender and Challenges from 1870-1983 showing closeness of load water-line lengths of challengers and defenders, Appdx, at CA 879, JA 2387.

. This same feeling is reflected in a statement made by the concurrer at the Appellate Division that he could not "agree, however, with the proposition that the America’s Cup competition is now, if it ever was, a paradigm of good sportsmanship” (150 AD2d 82,107 [concurring opn, Rubin, J.]).