OPINION OF THE COURT
Joseph G. Makowski, J.
Background
Plaintiff, Metal Goods and Manufacturers Insurance Trust Fund, is a New York workers’ compensation self-insurance trust fund organized pursuant to the Workers’ Compensation Law and 12 NYCRR part 317.
On or about December 1, 1991, the Trust Fund was formed for the purpose of providing a fund for receiving contributions and to provide benefits for eligible employees in accordance with the Workers’ Compensation Law of the State of New York. Defendants are all former employers and inactive or former members of the Trust Fund having terminated their respective participation in the Trust Fund at various times prior to the institution of this action. (Plaintiffs complaint 1? 14.)
On or about October 12, 2004, the New York State Workers’ Compensation Board issued an audit, known as a level I review, of the Trust Fund which, among other things, determined that the Trust Fund had a regulatory deficit of $583,180 for 2003 which required the Trust Fund to establish a plan, pursuant to 12 NYCRR 317.9 (4), to fund the deficit and restore its financial stability. (Gidwitz affidavit of Jan. 12, 2007, exhibit G.)
On or about November 8, 2004, the New York State Workers’ Compensation Board deemed the Tmst Fund to be underfunded pursuant to 12 NYCRR 317.9 and directed it to “develop a mutually acceptable corrective action plan” {see Gidwitz affidavit, exhibit H). As of November 8, 2004, the projected loss for the Trust Fund for fiscal year 2004 was an additional $1,500,000. (Gidwitz affidavit, exhibit I.)
On or about October 15, 2004 and November 18, 2004, plaintiff adopted a resolution and a plan to issue a $2 million assessment to fund the deficit of $583,180 and projected loss of $1,500,000 by assessing active and inactive members of the Trust Fund. (Gidwitz affidavit, exhibit J.)
On or about December 1, 2004, the Trust Fund issued invoices to all current and inactive members of the Trust Fund for *610 amounts totaling $2 million. (Gidwitz affidavit, exhibit K.) Each of the named defendants were invoiced by plaintiff. Each of the defendants has refused to pay the invoice(s). Defendants maintain the Trust Fund agreement does not allow plaintiff to impose a retroactive rate assessment upon former employers who are inactive members of the Trust Fund. Defendants further maintain that plaintiffs reliance upon Workers’ Compensation Law § 50 (3-a) and the provisions of 12 NYCRR 317.4 (a) (5) (ii) is misplaced and no retroactive rate assessment may be imposed upon them because the Workers’ Compensation Board has determined the Trust Fund to be underfunded.
The Motions before the Court
Plaintiff moves for an order pursuant to CPLR 3212 granting summary judgment in its favor against Advent Tool & Mold, Inc., Blackstone Business Enterprise, Inc., Coastel Cable Tools (Int’l) Corporation, Dowcraft Corporation, Eastman Machine Company, Inc., Emil Von Dungen, Inc., GEM Screw Machine Company, Great Lakes Pressed Steel Corporation, Hartman Enterprises, Inc., Hebeler Corporation, J.D. Cousins, Inc., Manitoba Corporation, Mill-Max Mfg. Corp., Nutall Gear, LLC, and Riley Gear Corporation (hereinafter collectively referred to as the defense group), and West Falls Machine Co., Inc., and partial summary judgment against Precision Mfg., Inc. The defense group cross-moves for an order pursuant to CPLR 3212 granting them summary judgment on their first counterclaim and a declaration that plaintiff has no legal right to impose assessments upon former members of the Trust Fund. For similar reasons, defendants, West Falls Machine Co., Inc. and Precision Mfg. Inc., cross-move for an order pursuant to CPLR 3212 granting summary judgment dismissing the complaint against them.
For the reasons set forth below, this court denies plaintiffs motion for summary judgment against defendants. The court grants the cross motion of the defense group awarding summary judgment on their first counterclaim and declares that plaintiff has no legal right to impose assessments upon former members of the Trust Fund. Plaintiffs complaint against the defense group is dismissed as a matter of law. The court further grants the cross motion of defendants West Falls Machine Co., Inc. and Precision Mfg., Inc. for summary judgment dismissing the complaint against, them.
*611 Statement of Facts
Plaintiff is a New York workers’ compensation self-insurance trust fund organized pursuant to the Workers’ Compensation Law and 12 NYCRR part 317, having its offices at 610 Rand Building, 14 Lafayette Square, Buffalo, New York 14203.
On or about December 1, 1991, the Trust Fund was formed for the purpose of providing a fund for receiving contributions and to provide certain benefits for eligible employees in accordance with the Workers’ Compensation Law of the State of New York.
The instrument forming the Trust Fund was a certain “Agreement and Declaration of the Trust Establishing The Metal Goods Insurance Trust Fund,” also known as Metal Goods and Manufacturers Insurance Trust Fund dated October 1, 1991, as amended from time to time (hereinafter referred to as Declaration of Trust or Trust Agreement). (Gidwitz affidavit, exhibit D.)
The Trust Fund also promulgated certain “Rules and Regulations of the Trustees of the Metal Goods and Manufacturers Insurance Trust Fund,” as amended from time to time (hereinafter referred to as rules and regulations). (Gidwitz affidavit, exhibit E.)
Pursuant to article X, § 9 of the Declaration of Trust, each defendant, as an “Employer” (defined in Trust Agreement, art I, § 1) as set forth in the Trust, agreed to be jointly and severally liable for the discharge of the obligations of each employer under the Declaration of Trust with respect to the Workers’ Compensation Law and Disability Benefits Law (Workers’ Compensation Law art 9).
In becoming a member of the Trust Fund, each of the defendants executed a participating employer application wherein each agreed to the terms and provisions of the Trust Agreement establishing the Trust Fund dated as of October 1, 1991, and further agreed to be bound by all of the terms of said Trust Agreement, including any duly adopted regulations promulgated by the trustees. (Gidwitz affidavit, exhibit F.) In relevant part, the participating employer application recites:
“PARTICIPATING EMPLOYER APPLICATION “The undersigned Employer engaged in the fabrication and manufacture of metal goods desires to be a participant in the Metal Goods Insurance Trust Fund and agrees to all of the terms and provision of the Agreement and Declaration of Trust establish *612 ing the Metal Goods Insurance Trust Fund, dated as of October 1, 1991, and further agrees to be bound by all of the terms of said Agreement and Declaration of Trust including any duly adopted regulations promulgated by the Trustees thereof.”
On or about October 12, 2004 the New York State Workers’ Compensation Board issued an audit, known as a level I review, of the Trust Fund which, among other things, found that the Trust Fund had a regulatory deficit of $583,180 for 2003 and which required the Trust Fund to establish a plan, pursuant to 12 NYCRR 317.9 (4), to fund that deficit and restore the Trust Fund’s financial stability. (Gidwitz affidavit, exhibit G.)
On or about November 8, 2004, the New York State Workers’ Compensation Board deemed the Trust Fund to be “underfunded” pursuant to 12 NYCRR 317.9, and directed it to “develop a mutually acceptable corrective action plan.” (Gidwitz affidavit, exhibit H.) As of November 8, 2004, the projected loss for the Trust Fund for fiscal year 2004 was an additional $1,500,000. (Gidwitz affidavit, exhibit I; profit and loss statement dated Nov. 10, 2004.)
On or about October 15, 2004 and November 18, 2004, the trustees of the Trust Fund adopted a resolution and a plan to issue a $2 million assessment to fund the regulatory deficit of $583,180 and projected loss of $1,500,000. The applicable minutes and resolution with the schedule of assessments is attached in the Gidwitz affidavit, exhibit J.
As alleged in paragraph 14 of the plaintiffs complaint, each of the defendants is an inactive member of the Trust Fund, having previously terminated their participation in the Trust Fund. (Gidwitz affidavit, exhibit A.) On or about December 1, 2004, the Trust Fund issued invoices to all current and inactive members of the Trust Fund for amounts totaling $2 million deemed necessary by the trustees to fund the said regulatory deficit of $583,180 and the projected 2004 fiscal year loss of $1,500,000. The Trust Fund invoices to the defense group, West Falls Machine Co., Inc. and Precision Mfg., Inc. are attached as exhibit K to the Gidwitz affidavit.
The Trust Fund invoices were duly delivered to the defense group, West Falls Machine Co., Inc. and Precision Mfg., Inc. All defendants refused to pay the invoiced amounts. On the record before the court, it is uncontroverted that each defendant has terminated its membership in the Trust Fund. (Defense group affidavits.)
*613 Plaintiff contends the defense group, West Falls Machine Co., Inc., and Precision Mfg., Inc. remain liable to the Trust Fund for contributions pursuant to article X, § 9 of the Declaration of Trust, Workers’ Compensation Law § 50 (3-a), and 12 NYCRR 317.4 (a) (5) (ii). Defendants maintain they are former employers and inactive members of the Trust Fund, and as such they may not be issued any assessments for contributions under article X, § 9 of the Declaration of Trust. Defendants further maintain that, as former employers and inactive members of the Trust Fund, they are not obligated to pay a retroactive rate assessment under the provisions of Workers’ Compensation Law § 50 (3-a) or 12 NYCRR 317.4 (a) (5) (ii).
The court now turns its attention to the standard of review governing disposition of a summary judgment motion.
Summary Judgment Standard of Review
CPLR 3212 (b) provides, in relevant part, that a motion for summary judgment “shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party.” (See Gilbert Frank Corp. v Federal Ins. Co., 70 NY2d 966 [1988]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065 [1979].) Once the movant’s initial burden is met, it becomes incumbent upon the party opposing the motion to “produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact upon which the opposing claim rests.” (Gilbert Frank Corp., 70 NY2d at 967, citing Zuckerman v City of New York, 49 NY2d 557, 562 [1980].)
In Zuckerman v City of New York (49 NY2d 557, 562 [1980]), the Court of Appeals stated that mere conclusions, expressions of hope, or unsubstantiated allegations or assertions are insufficient to warrant denial of the motion. In Dougherty v Kinard (215 AD2d 521 [2d Dept 1995]), the Court held that if the moving party has demonstrated that there are no material and triable issues of fact, the motion should be granted. In opposing a motion for summary judgment, the plaintiff must lay bare its proof and prove by evidence in admissible form that there exists a genuine issue of fact requiring a trial (Sweet Pea Fruit Exch. v Herrill Bowling Corp., 123 AD2d 622 [2d Dept 1986]).
“The test on summary judgment is whether the issue is one of law or fact.” (Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291 [1973].) Where, as is the case *614 here, the “intention [of the parties] is determinable by written agreements, the question is one of law, appropriately decided ... on motion for summary judgment.” (Id. at 292; see also Long Is. R.R. Co. v Northville Indus. Corp., 41 NY2d 455 [1977]; Keith v Houck, 88 AD2d 763 [4th Dept 1982].)
Additionally, “courts have declared on countless occasions that it is the responsibility of the court to interpret written instruments” (Mallad Constr. Corp., 32 NY2d at 291). Equally well established is the rule that “[w]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law” (General Phoenix Corp. v Cabot, 300 NY 87, 92 [1949]; Medex, Inc. v Cisatlantic Corp., 98 NYS2d 269 [1950]; In re Rivas’ Trust, 100 NYS2d 357 [1950]).
The motions before the court center on the question of whether the plaintiff has authority under the Trust Agreement to issue a retroactive rate assessment against former employers who are inactive Trust Fund members. This is a legal question determinable from the unambiguous language employed in the Trust Agreement and summary judgment is appropriate.
With respect to the parties’ contentions under Workers’ Compensation Law § 50 (3-a) and 12 NYCRR part 317, statutory or regulatory interpretation is an issue of law for the court and summary judgment is also appropriate.
The Harte Case
In support of its motion for summary judgment, plaintiff relies upon and requests this court to follow Harte v Association for the Advancement of the Blind & Retarded (2007 NY Slip Op 34362[U] [Sup Ct, NY County 2007, Goodman, J.], which addressed issues similar to those raised in the present action.
In Harte, the court addressed the issue of whether the trustees of the New York Health Care Facilities Workers’ Compensation Trust (hereinafter referred to as NY Health Trust) could pursue a claim against the Association (AABR), a former member, for its pro rata share of an assessment for the period when it was a member of NY Health Trust.
In Harte, the trial court ruled that article III, § 4 of the indemnity agreement between NY Health Trust and AABR specifically authorized a deficiency assessment against a member whether or not the member was still in good standing. The decision recites:
“Thus, under the Indemnity Agreement, it is clear *615 that all members of the Trust, whether current or former, are required to pay deficiency assessment ‘for any Trust year’ that such member participated, ‘whether or not still a member in good standing’ . . . Hence, under the Indemnity Agreement, AABR is contractually required to pay the assessment, . . . even though [AABR] is no longer a current member of the Trust.” (Harte at *7.)
The Trust Agreement at issue in this case has no comparable provision to that contained in the indemnity agreement in the Harte case. In fact, the language of article IX, § 4 of the Trust Agreement at issue in this action expressly addresses termination of individual employers. The provision provides:
“ARTICLE IX — DURATION AND TERMINATION OF THE TRUST
“Section 4. Termination of Individual Employers. An Employer shall cease to be an Employer within the meaning of this Agreement and Declaration of Trust when he is no longer obligated to make contributions to the Trust Fund or has ceased to qualify as an Employer hereunder due to failure to make the required contributions or [in] any way ceases to qualify as an eligible Employer.
“The operative provision of Article X, Section 9 of the Trust specifically provides: [in] the event [the] unreserved assets of the fund are insufficient . . . the Trustees shall require an additional payment by the Employers in the form of a rate increase and each Employer (as defined in Article I of the Trust) agrees to pay such rate increase amount to the fund on demand.”
The operative language of article X, § 9 of the Trust Agreement addressing plan “underfunding” is limited to “Employers” as contrasted to former employers and authorizes “a rate increase” as contrasted to a retroactive rate assessment. Plaintiffs reliance upon the trust analysis section of Harte is misplaced since this aspect of the decision is distinguishable from the present action.
Similarly, plaintiffs reliance upon the Workers’ Compensation Law section of the Harte decision is factually and procedurally misplaced. The record in Harte demonstrates that, at the time of Justice Goodman’s ruling, the NY Health Trust had been dissolved by the Workers’ Compensation Board. (Harte at 7.)
*616 In the present case, the Workers’ Compensation Board, in its letter of November 8, 2004, determined the Trust to be “underfunded” requiring corrective action. On the present record, there is no evidence of plaintiffs default, insolvency, or dissolution requiring the Workers’ Compensation Board to administer claims. This distinction is critical to plaintiffs efforts to fashion a public policy argument under Workers’ Compensation Law § 50 (3-a) or 12 NYCRR 317.4 (a) (5) (ii).
In the view of the court, the statutory and regulatory framework of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii) mandate trust fund default, dissolution, insolvency, or Workers’ Compensation Board administration of claims to successfully advance a policy argument allowing a retroactive rate assessment against a former member under the joint and several liability provisions of the statute and regulations. In this case, the Workers’ Compensation Board, on November 8, 2004, determined the plaintiffs trust to be underfunded but there was no declared default, dissolution, insolvency, or Workers’ Compensation Board administration of claims. The need for such default, dissolution or insolvency by a trust is reiterated by the Workers’ Compensation Board on its Web site:
“Group self-insurers are required to establish and maintain trust assets in an amount that exceeds trust liabilities, as those terms are defined in Section 317.2 of the Rules and Regulations. Group self-insurers who fail to comply with this capitalization standard shall be deemed ‘under-funded’ and shall immediately provide the chair with an acceptable plan of action as may be appropriate in order to make up the deficiency in a timely manner. Such underfunded groups may also be subject to any or all of the provisions set forth in Section 317.9 of the Rules and Regulations.
“In the event of the insolvency of a group self-insurer, participating members would be held jointly and severally liable for the unpaid obligations of the group incurred during the time of the employers’ participation. For this reason, employers interested in participating in a group should review all relevant documentation of the group self-insurer, including, but not limited to: the group’s independently audited financial statement; the trust document and by-laws; and the group’s methodology for develop *617 ing contribution levels.” (Http://www.wcb. state.ny.us/content/main/SiLr/selfms_wc.jsp [emphasis added], cached at http://www.nycourts.gov/ reporter/webdocs/self_insurance_workers_comp. htm.)
Under Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii), plaintiff may not advance a public policy argument which maintains the right to impose an assessment upon inactive members in the absence of Trust Fund default, dissolution, insolvency, or administration of claims by the Workers’ Compensation Board. The public policy analysis of Harte is not applicable to plaintiffs “underfunding” situation in the absence of Trust Fund default, dissolution, insolvency, or Workers’ Compensation Board administration of claims. On the record before the court, this aspect of Harte is factually, procedurally and legally distinguishable. Accordingly, the court declines plaintiffs invitation to follow this aspect of the Harte decision.
The court now turns its attention to the merits of the parties’ contentions under the Trust Agreement, Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii).
Analysis of Trust Agreement, Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and Other Relevant Documents
Of necessity, the court is required to analyze the operative language of the Declaration of Trust, together with the relevant provisions of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317, 12 NYCRR 317.4 (a) (5) (ii) and other relevant documents described below.
The Gregory Letter of May 15, 1995
By letter dated May 15, 1995, Kevin Gregory, in his capacity as a third-party administrator of the Trust, wrote to Philip Dag-gar of C.J. Winter Machine Works, Inc. (Kevin Cross affidavit, exhibit J.) As trust administrator, Mr. Gregory is an agent of the plaintiff. In the text of the letter, Mr. Gregory recites:
“Dear Phil:
“This letter outlines the major concerns I have as respects our trust document’s effectiveness. . . .
The Trustees’ authority to issue assessments to the members in the event it is required, is not currently clearly addressed in the trust document. The closest reference to this authority is in Article X — Miscel *618 laneous Provision; Section 9 Limitation of Liability, paragraph (c) (Pg. 19). It appears that if an assessment was necessary, ‘members’ can be assessed through ‘rate increases’ by the Trustees. However, if you are not a ‘member,’ you cannot be forced to pay. If a member wished to escape an assessment or a ‘rate increase’, I believe they could do so by stopping premium payments and thereby being cancelled from coverage, thereby ceasing their status as a ‘member’ and escape responsibility for further contributions.
“It may be desireable [sic] to have an assessment mechanism that would tie responsibility for assessments to each policy year, that is, each member would be assessable even after they left the Trust fund if the Trustees decided to assess members for that previous policy year’s operating deficit.” (Emphasis added.)
While the court determines the relevant provisions of the Declaration of Trust to be unambiguous, as a matter of law, the Gregory letter is relevant to the extent it acknowledges the drafting omissions in the document which undermine plaintiff’s contentions with respect to its right under the Trust Agreement to assess former members.
Participating Employer Application
In relevant part, the Trust Fund participating employer application recites:
“PARTICIPATING EMPLOYER APPLICATION “The undersigned Employer engaged in the fabrication and manufacture of metal goods desires to be a participant in the Metal Goods Insurance Trust Fund and agrees to all of the terms and provisions of the Agreement and Declaration of Trust establishing the Metal Goods Insurance Trust Fund, dated as of October 1, 1991, and further agrees to be bound by all of the terms of said Agreement and Declaration of Trust including any duly adopted regulations promulgated by the Trustees thereof.”
The Trust Agreement
The Declaration of Trust establishing the Trust Fund is attached as exhibit D to the Gidwitz affidavit. In relevant part, the Trust Agreement recites:
“ARTICLE I — DEFINITIONS
“Section 1. Employer. The term ‘Employer’ as used *619 herein shall mean a person or persons, whether individual proprietors, partnerships, firms, or corporation who:
“(a) are, or shall hereafter become, engaged in the fabrication and manufacture of metal goods, and “(b) are accepted as participants in this Trust by the Trustees in accordance with the terms of this Agreement, and
“(c) signify a desire in writing to become a participant in this Trust and agree in writing to be bound by the terms and provisions of this Trust Agreement and any duly adopted regulations of the Trustees. . . .
“ARTICLE VI — PARTICIPATION OF EMPLOYERS IN THE TRUST
“Section 1. Eligibility. Any Employer who qualifies under Section 1 of Article I is eligible for participation in the Trust.
“Section 2. Termination of Qualifications of an Employer for Participation in the Trust. An Employer shall cease to qualify for participation in the Trust for any insurance when he fails to make an Employer Contribution for the insurance on the date when due or within thirty days of the date due for the payment thereof; or if an Employer shall cease to qualify under or by reason of any State or Federal law; or when the Employer fails to comply with the rules and regulations made by the Trustees from time to time with the respect to the administration of the group insurance Trust Fund . . .
“ARTICLE IX — DURATION AND TERMINATION OF THE TRUST . . .
“Section 4. Termination of Individual Employers. An Employer shall cease to be an Employer within the meaning of this Agreement and Declaration of Trust when he is no longer obligated to make contributions to the Trust Fund or has ceased to qualify as an Employer hereunder due to the failure to make the required contributions or [in] any way ceases to qualify as an eligible Employer.
“ARTICLE X — MISCELLANEOUS PROVISIONS
“Section 9. Limitation of Liability, (a) Nothing in *620 this Agreement contained shall be construed as making one Employer liable for the payments required to be made by any other employer which is a party to this Agreement, except for the joint and several liability of the participating employers to discharge the obligations of each employer with respect to Chapter 600 of the Laws of the State of New York known as Workers’ Compensation Law and Disability Benefits Law.
“(b) None of the Employers shall be liable for failure of the Trustees to secure the benefits for any Employee whose name has been certified to the Trustees or for any default or neglect of the Trustees.
“(c) The Trustees shall establish and accumulate a reserve fund comprised of funds equal to the self-insurers outstanding liabilities and contingencies as determined in accordance with Rule 3 (12 NYCRR 316.3) of the Rules and Regulations governing self-insurers under the Workers’ Compensation Law.
“In the event the unreserved assets of the fund are insufficient to maintain such a reserve fund the Trustees shall forthwith prepare and implement a plan to require an additional payment by the Employers in the form of a rate increase which rate increase shall be sufficient to make up any deficiency. Each employer as defined in Article I, Definitions, Section 1, Employers, hereby agrees to pay such rate increase amount to the fund on demand.” (Emphasis added.)
It bears further emphasis that article X, § 9 (c) of the Trust Agreement clearly recites that “[i]n the event the unreserved assets of the fund are insufficient . . . the Trustees shall . . . require an additional payment by Employers in the form of a rate increase.”
In light of the termination provisions of article IX, § 4, the absence of language establishing the right of the Trust Fund to impose an assessment or rate increase against a former employer or inactive member undermines plaintiffs claim in this action under the Trust Agreement.
The Third Amendment to the Trust Agreement
In relevant part, the third amendment to the Declaration of Trust provides:
“Article I — Definitions “Section 1. Employer *621 “(a) The existing wording is superceded by the following: Are or shall hereafter become engaged in the classes of business as described in the Rules and Regulations of the Trustees of the Metal Goods Insurance Trust Fund, as amended.”
The Workers’ Compensation Law In support of its contention in this action, plaintiff relies upon Workers’ Compensation Law § 50 (3-a). In relevant part, this subdivision provides:
“(2) Any group consisting exclusively of such employers may adopt a plan for self-insurance, as a group, for the payment of compensation under this chapter to their employees. Under such plan the group shall assume the liability of all the employers within the group and pay all compensation for which the said employers are liable under this chapter, except that in the case of municipal corporations as herein defined no proof of financial ability or deposit of securities or cash need be made in compliance with this subdivision. . . .
“(3) . . . The insolvency or bankruptcy of a participating employer shall not relieve the group self-insurer from the payment of compensation . . . .”
The Workers’ Compensation Board Web site In relevant part, the Workers’ Compensation Board Web site which addresses self-insured plans recites:
“Group self-insurers are required to establish and maintain trust assets in an amount that exceeds trust liabilities, as those terms are defined in Section 317.2 of the Rules and Regulations. Group self-insurers who fail to comply with this capitalization standard shall be deemed ‘under-funded’ and shall immediately provide the chair with an acceptable plan of action as may be appropriate in order to make up the deficiency in a timely manner. Such under-funded groups may also be subject to any or all of the provisions set forth in Section 317.9 of the Rules and Regulations.
“In the event of the insolvency of a group self-insurer, participating members would be held jointly and severally liable for the unpaid obligations of the group incurred during the time of the employers’ participation. For this reason, employers interested in participating in a group should review all rele *622 vant documentation of the group self-insurer, including, but not limited to: the group’s independently audited financial statement; the trust document and by-laws; and the group’s methodology for developing contribution levels.” (Http://www.web. state.ny.us/content/main/SiLr/selfins_wc.jsp [emphasis added], cached at http://www.nycourts.gov/ reporter/webdocs/self_insurance_workers_comp. htm.)
12 NYCRR part 317
In relevant part, 12 NYCRR part 317 recites:
“Section 317.1. Statement of purpose “To establish application procedures, qualifications and responsibilities for any group of employers which desires to become, or which has been approved to operate as, a group self-insurer.
“Section 317.2. Definitions “For purposes of these rules, . . .
“(h) ‘Group member’ or ‘employer’ shall mean an individual employer that is participating in a group self-insurance arrangement in accordance with subdivision (3-a) of section 50 of the Workers’ Compensation Law.
“(i) ‘Group self-insurer,’ ‘employer group,’ ‘group,’ or ‘self-insurance trust,’ shall mean an association of employers performing related activities in a given industry that contractually agree, in accordance with section 50 (3-a) of the Workers’ Compensation Law, to assume the workers’ compensation liabilities of each associated member. . . .
“(q) ‘Termination’ shall mean (i) such action taken by a group self-insurer to remove a group member from participation in the group, or (ii) the cessation of a group’s status as a self-insurance trust.
“(r) ‘Withdrawal’ shall mean such action taken by a group member to remove itself from a group self-insurer. . . .
“Section 317.4. Application requirements for authorization of new employer groups . . .
“(a) . . .
“(5) with the exception of groups consisting exclusively of municipal corporations:
“(i) the trust agreement, with language prescribed *623 by the chair and in a form approved by the chair, which must be shared with all prospective members of the group and which must be signed by each of the trustees of the group;
“(ii) the participation agreement, with language prescribed by the chair and in a form approved by the chair, which must be shared with all prospective members of the group and which must be individually executed by each member of the group, and which shall include an acknowledgment that the prospective member has been provided a copy of the trust agreement and has reviewed that agreement, specifically the provisions related to joint and several liability, the methodology utilized to determine member contributions, the annual adjustment to contributions, and to membership terms. . . . “Section 317.9. Terms and procedures applicable to under-funded group self-insurers “(a) Group self-insurers are required to maintain at all times sufficient trust assets within the trust fund to exceed claims and all other liabilities.
“(b) Group self-insurers whose assets do not exceed liabilities are deemed to be under-funded and may be subject at any time to any or all of the following provisions, at the discretion of the chair:
“(1) the chair may call for a meeting with the group’s board of trustees and/or group administrator to discuss the financial condition of the trust fund and to determine the appropriate course of action to restore the trust fund’s financial stability in a timely manner; . . .
“(4) the chair may require a written plan from the group’s board of trustees and/or group administrator in order to restore the trust fund’s financial stability. Such written plan must be in a form and content acceptable to the chair including, but not limited to, a projected plan for member contributions for the next five years or such additional period of time as the chair may require; . . .
“(7) the group self-insurer may be required to immediately levy an assessment upon the group members to take such other action as may be appropriate in order to make up the deficiency.
“(c) If the chair determines that the financial stability of the under-funded trust fund cannot be re *624 stored in a timely and appropriate manner, the chair may revoke the group’s self-insurance status.” (Emphasis added.)
It bears further emphasis that 12 NYCRR 317.9 (b) (7) recites that the group insurer may be required “to immediately levy an assessment upon the group members.” The language does not address the right of a group to levy a retroactive rate assessment upon a former group member.
Workers’ Compensation Board Level I Review
On October 12, 2004, the New York State Workers’ Compensation Board Office of Self-Insurance issued a level I review of the Trust Fund for the period as of December 31, 2003. (Gidwitz affidavit, exhibit G.) In relevant part, the level I review recites: “Based upon each of the adjustments described above, the Trust had a net decrease of $212,014 in Trust Assets from $3.25M to $3.04M and an increase of $538,300 in liabilities from $3.09 to $3.63M.
These adjustments resulted in a decrease in the Trust’s equity from a surplus of $167,134 presented on the GAAP statements to a regulatory deficit of $583,180, or an 83.91% trust equity ratio. The Rules and Regulations which govern group trusts state that trust assets must exceed trust liabilities. As a result, by a strict regulatory definition, this group is not adequately funded, and those sanctions applicable to under funded groups may be considered.”
The Workers’ Compensation Board Letter of November 8, 2004 On November 8, 2004, Kevin White, principal accountant of the Workers’ Compensation Board, directed a letter to Kevin Gregory, president of Neuman Claim Administrators, Inc., third-party plan administrator of plaintiff. (Cross affidavit, exhibit G.) In the text of the letter, Mr. White recites:
“Based on the requirements set forth in NYCRR Part 317, which states that group self-insurers are required to establish and maintain trust assets in an amount which exceeds trust liabilities, the Metal Goods and Manufacturers Insurance Trust Fund is deemed underfunded. Accordingly, the Chair, pursuant to his authority and discretion under Part 317.9 of the Rules and Regulations and in order to protect the financial integrity of any trust deemed underfunded and the members that have participated in the underfunded group self-insurance program, the Board directs that you comply with the following *625 provisions:
“• Suspend the addition of any new members into the Group, effective immediately, pursuant to Part 317.9 (b) (5). The WCB will, however, allow you to honor quotes made prior to November 8, 2004, if the employer becomes a participating member of the group by January 1, 2005. . . .
“•In order to protect the financial integrity of any trust deemed underfunded and the members that have participated in the underfunded group self-insurance program, the WCB has taken the following position with regard to members who wish to terminate their membership from a group trust that is deemed underfunded: . . .
“The WCB considers it the responsibility of the Group Administrator to convey the above information regarding the movement of members in an underfunded group, to all participating members of the Trust and the insurance brokers associated with the Trust.”
In his letter of November 8, 2004, Mr White is silent in addressing the issue of the Trust Fund’s imposition of a retroactive rate assessment upon inactive or former members of the Trust Fund.
The Workers’ Compensation Board Letter of December 22, 2004 By letter dated December 22, 2004, Kevin White, principal accountant of the Workers’ Compensation Board, again wrote Kevin Gregory, president of Neuman Claim Administrators, Inc. (cross affidavit, exhibit K). In the text of the letter, Mr. White recites:
“We have reviewed the financial condition as of December 31, 2003 of the trust noted above, and our review indicates that this group trust is in an under-funded position as that term is defined in Part 317 NYCRR.
“In light of the Trust’s current financial condition, this letter serves to remind members of their obligations under the Workers’ Compensation Law. Members participating in a group trust are deemed to be jointly and severally liable for all Workers’ Compensation obligations incurred by the Trust, during the period of the employer’s membership. . . . Therefore, all obligations of the Trust and the deficit recently reported are the joint and several responsi-
*626 bility of each of the group’s members ....
“In the event that the group goes into default (i.e. a claimant is paid late, or goes unpaid) the Workers’ Compensation Board will step in and administer the trust including the enforcement of the joint and several provisions.” (Emphasis added.)
It bears emphasis that the White letter recites that the Trust Fund is in an underfunded position. The White letter does not recite that the Trust Fund is in default, dissolution or insolvency. The White letter makes it clear that in the event the Trust Fund were to go into default, the Workers’ Compensation Board “will step in and administer the trust including the enforcement of the joint and several provisions.”
The White letter of December 22, 2004 clearly distinguishes between the situation where a trust is “underfunded” or is in “default” as a trigger mechanism for Workers’ Compensation Board administration and enforcement of the joint and several provisions of Workers’ Compensation Law § 50 and 12 NYCRR part 317.
The court now turns its attention to the construction rules governing interpretation of the trust agreements.
The Construction Rules Governing Interpretation of the Trust Agreement
“The first and best rule of construction of every contract. . . is that, when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein.” (Nichols v Nichols, 306 NY 490, 496 [1954]; see also Brainard v New York Cent. R.R. Co., 242 NY 125 [1926]; Caldwell Farms v Diaher Supermarket, 170 AD2d 1046 [4th Dept 1991]; Del Vecchio v Cohen, 288 AD2d 426 [2d Dept 2001].) “A contract is unambiguous if the language it uses has a ‘definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.’ ” (Greenfield v Philles Records, 98 NY2d 562, 569 [2002], quoting Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978].)
Defendants Are No Longer Employers under the Trust Agreement
In paragraph 14 of the complaint, plaintiff acknowledges that defendants are inactive members under the provisions of the Trust Agreement. (12 NYCRR part 317.)
Under article IX, § 4 of the Trust Agreement, former members of the Trust are not “Employers.” The provision recites:
*627 “An Employer shall cease to be an Employer within the meaning of this Agreement and Declaration of Trust when he is no longer obligated to make contributions to the Trust Fund or has ceased to qualify as an Employer hereunder due to the failure to make the required contributions or [in] any way ceases to qualify as an eligible Employer.”
The threshold legal question is whether the Trust Fund has the authority under the Trust Agreement to assess former employers who are inactive members. (Defense group affidavits lili 4, 5.) Article X, § 9 of the Trust Agreement only addresses the liability of employers of the Trust Fund in an underfunding situation. Article X — Miscellaneous Provisions, § 9 Limitation of Liability, paragraph (c) of the Trust Agreement provides as follows:
“(c) The Trustees shall establish and accumulate a reserve fund comprised of funds equal to the self-insurers outstanding liabilities and contingencies as determined in accordance with Rule 3 (12 NYCRR 316.3) of the Rules and Regulations governing self-insurers under the Workers’ Compensation Law.
“In the event the unreserved assets of the fund are insufficient to maintain such a reserve fund the Trustees shall forthwith prepare and implement a plan to require an additional payment by the Employers in the form of a rate increase which rate increase shall be sufficient to make up any deficiency. Each employer as defined in Article I, Definitions, Section 1, Employers, hereby agrees to pay such rate increase amount to the fund on demand.” (Emphasis added.)
During the period when defendants participated as employers in the Trust, they submitted payroll reports, remitted premium payments, received claims activity reports and otherwise participated in the business activities of the Trust Fund. On different dates, but in all instances, each defendant ceased participation as employers in the Trust thereby becoming inactive members.
The record unequivocally establishes that defendants are former employers who terminated or withdrew their participation in the Trust thereby becoming inactive members. On the record before the court, defendants ceased: (1) providing workers’ compensation for their employees through the Trust; (2) having any management role in the Trust; (3) having the right to vote; *628 and (4) receiving financial reports and information pertaining to the operation of the Trust. Each defendant either terminated or had their status as employers under the Trust terminated by the trustees of the Trust, thereby extinguishing their classification as employers under the Trust. Plaintiff acknowledges the status of defendants as inactive members in paragraph 14 of the complaint. Plaintiffs argument based on article X, § 9 (c) of the Trust Agreement, that a retroactive rate assessment is effective against the defendants, fails as none of the defendants are employers as defined in the Trust Agreement.
Plaintiffs Assessment of November 18, 2004 Is Not a “Rate Increase” under the Trust
The Trust’s retroactive rate assessment of November 18, 2004 (Gidwitz affidavit, exhibit J) is not a “rate increase” under article X, § 9 of the Trust Agreement. Article X, § 9 (c) of the Trust Agreement specifically provides that where the “assets of the fund are insufficient” to meet the funding requirements set forth in the Workers’ Compensation Board rules and regulations, the Trust must “require an additional payment by the Employers in the form of a rate increase which rate increase shall be sufficient to make up any deficiency” (emphasis added).
The Court of Appeals has held that when construing a trust agreement,
“[w]e are to search, not for the probable intention of the settlor merely, but for the intention which the trust deed itself, either expressly or by implication, declares. We are to ascertain the intention from the words used and give effect to the legal consequences of that intention when ascertained.” (Central Union Trust Co. v Trimble, 255 NY 88, 93 [1930].)
“In such a case the intent of the parties, which is the decisive factor in a determination of the relative rights and obligations of the parties to written instruments, is to be found in the words which the parties themselves employ to express that intent.” (Matter of People, 288 NY 40, 46 [1942].) “The words chosen by the parties should not be unnaturally forced beyond their ordinary meaning.” (Brainard, 242 NY 125, 131 [1926].)
In interpreting a trust, a court must look to the intent of the settlor as expressed in the trust instrument where such intent is expressed in clear and unambiguous terms; absent ambiguity, a court may not read new terms into a trust instrument. *629 (Mercury Bay Boating Club v San Diego Yacht Club, 150 AD2d 82 [1st Dept 1989].) The trust instrument is to be construed as written and the settlor’s intention determined solely from the unambiguous language of the instrument itself. (Matter of Chase Manhattan Bank, 6 NY3d 456 [2006].)
Under the terms of the Trust Agreement, a rate increase is simply not an assessment. A rate increase is prospective in nature. In insurance, the term “rate” refers to “the premium charge per unit of insurance” (Webster’s New Universal Unabridged Dictionary 1602). The concept of a rate increase denotes equality of treatment, a spreading of risk typical of insurance. Absent contrary language in the Trust Agreement, a rate increase is traditionally imposed upon current members, not inactive members.
By way of example, defendant West Falls was paying a rate increase at the time of their cancellation by the Trust. A 20% rate increase was a surcharge which West Falls was paying because of what the Trust deemed unsatisfactory loss ratios in two of the very same years (1999 and 2001) for which the Trust now seeks to impose its retroactive rate assessment.
Arguably, the Trust Agreement could have provided for the imposition of a retroactive rate assessment upon a former employer or inactive member (Harte v Association for the Advancement of the Blind & Retarded at 1).
However, the Trust Agreement (art X, § 9 [c]) authorizes “an additional payment by Employers in the form of a rate increase.” The Trust Agreement provisions do not authorize an imposition of an assessment upon former employers or inactive members. The Gregory Letter of May 15, 1995
The trust administrator is Kevin M. Gregory. Mr. Gregory is the president of Neuman Claims Administrators, Inc. As trust administrator, Mr. Gregory is an agent of the plaintiff.
In correspondence dated May 15, 1995, Mr. Gregory provided an analysis of the Trust Agreement. Mr. Gregory concluded that “[t]he Trustees’ authority to issue assessments to the members in the event it is required, is not currently clearly addressed in the trust document. . .[and], . . [i]t appears that if an assessment was necessary, ‘members’ [of the Trust] can be assessed through ‘rate increases.’ ” (Cross affidavit, exhibit I [emphasis added].) With respect to former members, Mr. Gregory concluded that “if you are not a ‘member’ you cannot be forced to pay.” {Id. [emphasis added].)
*630 Mr. Gregory, as the trust administrator, admits that the Trust can only look to prospective rate increases on then current members, and goes on to state that former members “cannot be forced to pay.” The “gap” in the Trust Agreement language addressed by Mr. Gregory on May 15, 1995 was never addressed by plaintiff through amendment of the Trust Agreement prior to December 2004. Under the Trust Agreement provisions, there is no authority for the trustees to impose a retroactive rate assessment upon former employers who terminated or withdrew from participation in the Trust.
The Trust Only Has the Power to Impose a Prospective Rate
Increase upon Current “Employers” Not a Retroactive Rate Assessment upon Former Employers Who are Inactive
Members
On November 8, 2004, the Workers’ Compensation Board made its determination that the Trust was underfunded, pursuant to 12 NYCRR 317.9. (Cross affidavit, exhibit G.) The Workers’ Compensation Board did not declare the Trust Fund in default, insolvent or begin administration of claims. (Cross affidavit, exhibit G.) In an attempt to cure its underfunding situation, the Trust elected to impose a retroactive rate assessment on inactive members of the Trust. This action ignored the unambiguous language of the Trust Agreement.
Article X, § 9 (c) of the Trust Agreement plainly recites that in the event that the “assets of the fund are insufficient [pursuant to 12 NYCRR 316.6] . . . the Trustees shall forthwith prepare and implement a plan to require an additional payment by the Employers in the form of a rate increase which rate increase shall be sufficient to make up any deficiency.” (Emphasis added.) When faced with the Workers’ Compensation Board finding that the Trust was underfunded, the trustees’ options under the Trust Agreement were limited solely to the imposition of a rate increase on its current employers.
Case law prohibits the Trust from construing the language of the Trust Agreement using words neither contained nor implied therein. In Matter of Day (10 AD2d 220, 223 [1st Dept I960]), the Court held that in construing a trust indenture, the court “may neither insert that which does not appear in the [indenture], nor make substitutions.”
Likewise, the members of the Trust used the following language to determine what measures the Trustees should take in the event that the Trust experiences financial difficulty: *631 “[they] shall forthwith prepare and implement a plan to require an additional payment by the Employers in the form of a rate increase which rate increase shall be sufficient to make up any deficiency.” (Art X, § 9 [c] [emphasis added].) The words “Employers” and “rate increase” in the text must be given meaning and not ignored. If the Trust intended to include “former employers” or “retroactive rate assessments,” that language would have appeared in the Trust.
A “rate increase” is unequivocally a prospective forward-thinking concept. A retroactive rate assessment which seeks payment from former employers that have ceased participation in the Trust Fund is an attempted “claw back” assessment which does not qualify as a “rate increase.” In issuing the assessment that is the subject of this action, the Trust violated the unambiguous intent of the Trust Agreement to impose a rate increase on current employers as reflected in the language of the Trust Agreement. The Trust’s assessment against the defendants is void and unenforceable as a matter of law as violative of the unambiguous intent of the parties as set forth in the Trust Agreement.
Plaintiff Is Not in Default, Dissolution or Insolvency under the Workers’ Compensation Law nor Is the Workers’ Compensation Board Administering the Trust
Plaintiff advances a public policy argument to support the retroactive rate assessment against former members citing the provisions of Workers’ Compensation Law § 50 (3-a). The Trust also cites 12 NYCRR 317.4 (a) (5) (ii) to support the proposition that its retroactive rate assessment against former members is allowed.
Defendants do not dispute that Workers’ Compensation Law § 50 (3-a) requires notification that joint and several liability may be imposed upon those who are members of a self-insurance trust. It is the application of these provisions to the current situation that is in dispute between the plaintiff and the defendants. The court’s analysis of the joint and several liability sections of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii) shows that the joint and several liability provisions do not come into effect until a group goes into default (i.e., a claimant is paid late or goes unpaid), is dissolved or insolvent. Only then is the Workers’ Compensation Board required to administer the trust, including the enforcement of the joint and several liability provisions.
*632 12 NYCRR 317.4 (a) (5) (ii) provides that “the participation agreement [of the Trust] . . . shall include . . . provisions related to joint and several liability.” This language does not stand for the proposition that the Trust may ignore the language limitations of the Trust Agreement and impose retroactive rate assessments against former members not authorized by the Trust Agreement. The provisions of Workers’ Compensation Law § 50 (3-a) and 12 NYCRR 317.4 (a) (5) (ii) were not designed to cure drafting omissions in a trust agreement.
The Workers’ Compensation Board’s determination of the Trust’s underfunding on November 8, 2004 is not a triggering event for plaintiffs attempt to impose joint and several liability upon defendants for the underfunding situation. The Workers’ Compensation Board’s imposition of joint and several liability is a statutory remedy designed to protect employees who benefit from the Trust in the event of default, dissolution or insolvency, by a group. Workers’ Compensation Law § 50 (3-a) and the Workers’ Compensation Board Web site list “default” or “insolvency” as triggers for the imposition of employer joint and several liability. Nothing in the language of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 or 12 NYCRR 317.4 (a) (5) (ii) contemplates the provisions to be utilized by the Trust Fund against former members to address an underfunding situation in a manner not specifically authorized by the Trust Agreement.
The statutory and regulatory schemes of Workers’ Compensation Law § 50 (3-a) and 12 NYCRR 317.4 (a) (5) (ii) are unavailable to plaintiff to address the November 8, 2004 Workers’ Compensation Board’s finding that the Trust was underfunded. Since the statutory and regulatory schemes of Workers’ Compensation Law § 50 (3-a) and 12 NYCRR 317.4 (a) (5) (ii) are inapplicable, the court is not required to address the issue of plaintiffs standing to utilize the provision.
The court notes its rationale is supported by correspondence sent by the Workers’ Compensation Board to Kevin Gregory dated December 22, 2004. (Cross affidavit, exhibit K.) In that correspondence, the Workers’ Compensation Board specifically advised the Trust that “[t]he Board assumes that the group and its members will manage the deficit, and increase member contributions appropriately to ensure obligations are met.” {Id. [emphasis added].) This language directs the Trust to correct its deficit situation with future rate increases from members. No where does the Workers’ Compensation Board refer to former Trust members or retroactive rate assessments.
*633 The Trust misconstrues the joint and several obligation provisions of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii). Plaintiffs attempt to utilize the joint and several liability provisions of Workers’ Compensation Law § 50 (3-a), 12 NYCRR part 317 and 12 NYCRR 317.4 (a) (5) (ii) to remedy drafting omissions in the Trust Agreement is rejected as a matter of law.
In light of the disposition of this matter, the court is not required to address defendants’ remaining arguments.
Relief
For the reasons set forth herein, the court grants the relief recited below:
1. The motion of plaintiff for summary judgment against defendants on the issues of liability and damages is denied.
2. The cross motion of the defense group for partial summary judgment as to their first counterclaim against the plaintiff requesting a declaration that said defendants have no obligation for any claimed assessment of the Trust Fund and that none of said defendants are obligated to make any payments in connection with the purported assessment, be and the same is hereby granted. Plaintiffs complaint is dismissed as to all of the defense group defendants.
3. The cross motion of defendants West Falls Machine Co., Inc. and Precision Mfg., Inc. requesting summary judgment dismissing the complaint against them be and the same is in all respects granted.